Public Utilities Commission
No. 84-140

### APPEAL OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE
(New Hampshire Public Utilities Commission)

June 12, 1984

48

*Sulloway, Hollis & Soden*, of Concord (*Martin L. Gross* and *Margaret H. Nelson* on the brief, and *Mr. Gross* orally), for Public Service Company of New Hampshire.

*Gerald M. Eaton*, of Concord, by brief and orally, for The Community Action Program Belknap-Merrimack Counties, Inc.

*Michael W. Holmes*, of Concord, by brief and orally, as Consumer Advocate.

*Backus, Shea & Meyer*, of Manchester (*Robert A. Backus* on the brief and orally), for the Seacoast Anti-Pollution League.

*Douglas I. Foy* and *Armond M. Cohen*, of Boston, Massachusetts (*Mr. Foy* and *Mr. Cohen* on the brief, and *Mr. Foy* orally), for the Conservation Law Foundation of New England, Inc.

*Larry S. Eckhaus*, of Derry, by brief and orally, for the Campaign for Ratepayers' Rights, as *amicus curiae*.

*Shaines, Madrigan & McEachern*, of Portsmouth, and *Sharon A. Spickler*, of Dover (*Paul McEachern* and *Ms. Spickler* on the brief, and *Mr. McEachern* orally), for Paul McEachern, as *amicus curiae*.

SOUTER, J. At the request of Public Service Company of New Hampshire, the public utilities commission has transferred the following question of law to this court under RSA 365:20:

> "Does RSA 378:30-a, as a matter of law, prohibit the Public Utilities Commission from allowing public utilities to recover, through rates, amounts such utilities have invested in plant construction projects that have been abandoned?"

When we accepted the transfer, we said that we would limit our answer to the interpretation of the statute without regard to the constitutionality of its application, since the factual record was insufficient for an informed consideration of constitutional issues. After the company objected to this limitation, we asked the commission if it still desired an answer subject to our limitation. The commission replied that it did. We answer yes to the question transferred.

The question arises on these undisputed facts. In 1972 the company acquired an interest of 3.47 percent in a project to build a

nuclear electric power generating plant known as Pilgrim 2, in Plymouth, Massachusetts. The company had invested $15,926,729 in Pilgrim 2 when the owners cancelled the uncompleted construction in 1981. In 1983, the company petitioned the commission to provide "an appropriate ratemaking methodology" to allow it to recover its investment in the abandoned plant. Apparently, the company would prefer to do this by treating the investment as an expense to be recovered over the course of one year. Interlocutory Transfer at 1, 3.

To understand the question and the statute to which it refers, we must consider how the commission deals with the variables that determine the amount of revenue that the company may receive through rates. We stress that in the following discussion we will deal only with the process of setting rates to produce revenue. Some of the terms to be used occur in other regulatory contexts, where their functions differ from what we will be describing. We also stress that our discussion is not intended to describe the process of ratemaking in all of its complexity. Our concern here is only with the basic analysis necessary for an understanding of how the statute operates.

In simplest terms, revenue is allowed to equal the total of approved operating expenses plus a reasonable return on the value of certain property. The return is calculated by applying a rate of return to the cost less depreciation of the company's property that is "used and useful in the public service." RSA 378:27, :28; Interlocutory Transfer at 3. Operating expenses include salaries and wages, maintenance costs and taxes. Interlocutory Transfer at 3. The "used and useful" property is commonly spoken of as the rate base and includes the depreciated cost of plant in service and working capital. *Id.* Thus, the commission controls three variables in regulating rates to provide revenue to the company: operating expenses, rate base and rate or percentage of return allowed on the rate base.

For the company to recover its investment in Pilgrim 2, it must be allowed to generate revenue determined by these variables. The commission's control of these variables is limited by statutes, including RSA 378:30-a (Supp. 1981). To understand how those statutes affect the answer to the question before us, it is essential to consider the commission's authority to deal with a problem that arises whenever a utility builds a new plant: how should the utility raise the cost of money to be invested in the construction of the plant? That cost may take the form either of interest on funds borrowed by the company or of dividends to holders of the company's stock.

After a plant has begun to operate, the commission allows the company to recover the cost of money invested in it by including the depreciated cost of the plant in the rate base, on which it allows the

rate of return. During the period of a plant's construction, however, recovery of the cost of money invested in it is not dealt with so easily. In practice, this cost has not been treated as an item of current expense for ratemaking purposes. Nor has it been met simply by raising the rate of return to produce more revenue on the existing rate base. Such treatment would be more complicated than it might seem, and could be unpopular "among utilities and regulating bodies from the political or public relations standpoint." L. POMERANTZ AND J. SUELFLOW, ALLOWANCE FOR FUNDS USED DURING CON-STRUCTION 150 (1975). For ratemaking purposes, that leaves regulation of the rate base as a means to recover the cost of money incurred during construction. Regulators have tried one or the other of two alternatives.

One method is to add the capitalized cost of money incurred during construction to the investment and hence to the rate base when the plant begins to operate. This capitalized value is commonly spoken of as an allowance for funds used during construction, or AFUDC. *See Appeal of Public Serv. Co. of N.H.*, 122 N.H. 919, 451 A.2d 1321 (1982). During the period of a plant's construction, AFUDC treatment produces no cash flow from operations, and interest and dividends on money attributable to investment in that plant must be paid from other earnings or from borrowed or invested funds.

Traditionally in this State, as in most others, AFUDC has been the chosen alternative. *Re Pub. Serv. Co. of N.H.*, 63 N.H.P.U.C. 127 (1978). As generating plants grew in complexity and cost, the AFUDC method required a greater investment to pay for the cost of money during construction and produced a greater capitalized amount to be added to the rate base later. Hence, utilities sought an alternative to AFUDC by including the value of the uncompleted plant in the rate base. This treatment would produce an immediate cash flow to be used to pay the cost of the money invested in the plant.

This method is described as including construction work in progress, or CWIP, in the rate base. The term CWIP must be used with care, however, for it can have any one of three related meanings. It can of course refer to the partially complete physical construction. It can also be used in technical senses to refer to the cost of that construction, or finally to that cost after it has been added to the rate base. *See* POMERANTZ *et al., supra* at 150; Howe, *A Survey of Regulatory Treatment of Plant Cancellation Costs,* PUB. UTIL. FORT., March 31, 1983, at 52, 55. The commission defines a CWIP account as including "the total of the balances of work orders for electric plant in process of construction," provided that work orders "shall

be cleared from this account as soon as practicable after completion of the job." N.H. P.U.C. RULE 307.04, adopting 18 C.F.R. Part 101 § 107 A and B.

When the company acquired its share in Pilgrim 2, and when it began construction of the Seabrook nuclear power plant, the commission applied the AFUDC method to provide for recovery of the cost of investment. *Re Pub., Serv. Co. of N.H.*, 63 N.H.P.U.C. 127 (1978). In 1978, however, on the company's petition, the commission authorized CWIP treatment of the amounts spent by the company in constructing these plants. *Id.* On appeal, this court upheld the commission's authority to authorize inclusion of CWIP in the rate base, reasoning that the commission had discretion under RSA 378:27 and :28 to find as a matter of policy that the plant was used and useful during construction. *LUCC v. Public Serv. Co. of N.H.*, 119 N.H. 332, 402 A.2d 626 (1979).

Nevertheless, in 1979 the legislature enacted RSA 378:30-a (Supp. 1981), thus culminating opposition to the allowance of CWIP in the rate base that had begun in the 1977 legislative session. *See* 1977 H.B. 986; 1978 H.B. 5; 1979 H.B. 134, H.B. 155, H.B. 197. By its terms, the new statute eliminated the commission's delegated discretion to allow rates based on CWIP. *See Appeal of Legislative Utility Consumers' Council*, 120 N.H. 173, 412 A.2d 738 (1980). Thereafter, the commission reverted to the AFUDC treatment of the company's cost of money for plant under construction. *See Appeal of Public Serv. Co. of N.H.*, 122 N.H. 919, 451 A.2d 1321 (1982); Interlocutory Transfer at 2.

While the parties do not dispute that the terms of the new statute precluded the addition of investment to the rate base during the construction period, the question now before us is whether the terms of the statute are broad enough to preclude recovery of otherwise lost investment in a plant abandoned before completion of construction. The interlocutory transfer does not specifically describe how the value of the investment was computed, but we assume it includes both the cost of the actual construction and the cost of money used to pay for it.

The question is a broad one, which raises the following issues: whether the statute forbids the addition of the investment to the rate base subject to depreciation; whether it forbids the treatment of investment as a cost to be amortized and recovered over some period; and whether the investment in the abandoned plant may be recovered by increasing the rate of return.

These issues of statutory interpretation are all of first impression. While language in one of our earlier cases questioned whether the new statute left the commission with discretion to allow recovery of

investment in the present circumstances, *Appeal of Public Serv. Co. of N.H.*, 122 N.H. 1062, 1071, 454 A.2d 435, 440 (1982), the present question was not then squarely before the court. Nor is there any indication that the commission has taken a position on the question, though the commission's staff may have commented on it. *See* Howe, *supra* at 53–55.

To answer the question we begin with the text of the statute:

> "378:30-a *Public Utility Rate Base; Exclusions.* Public utility rates or charges shall not in any manner be based on the cost of construction work in progress. At no time shall any rates or charges be based upon any costs associated with construction work if said construction work is not completed. All costs of construction work in progress, including, but not limited to, any costs associated with constructing, owning, maintaining or financing construction work in progress, shall not be included in a utility's rate base nor be allowed as an expense for rate making purposes until, and not before, said construction project is actually providing service to consumers."

RSA 378:30-a (Supp. 1981).

Our examination will focus on the second sentence. While each of the three prohibitory sentences restricts the commission's discretion in some way, the second appears on its face to have the broadest scope both in time and in subject matter.

In addressing the issues of statutory interpretation, we follow familiar principles. In seeking the intent of the legislature, we will consider the language and the structure of the statute. *State v. Flynn*, 123 N.H. 457, 462, 464 A.2d 268, 271 (1983). We will follow common and approved usage except where it is apparent that a technical term is used in a technical sense. RSA 21:2. If the statute is unambiguous when so viewed, there is no justification for judicial modification, *State v. Flynn supra*, and we will look to legislative history as a guide to meaning only if ambiguity requires choice, *Greenhalge v. Dunbarton*, 122 N.H. 1038, 1040, 453 A.2d 1295, 1296 (1982).

In applying these principles, all but two of the parties take the position that the second sentence of the statute means what it appears to say: "At no time shall any rates or charges be based upon any costs associated with construction work if said construction work is not completed." While several provisions of the statute expressly deal with CWIP, most of the intervenors argue that the language does more than forbid the addition of CWIP to the rate

base during the period of construction. They urge us simply to recognize the language of the second sentence in a straightforward way as prohibiting the recovery of the investment in Pilgrim 2 through rates charged to consumers.

The company takes the position that the statute deals only with the treatment of CWIP, and that the statute's use of the term "construction work in progress" assumes the technical accounting definition of that phrase as the "total of the balances of work orders for electric plant in process of construction." N.H.P.U.C. RULE 307.04. From this it follows, in the company's view, that the statute regulates only the timing of recovery of investment, forbidding recovery during the period of the "process of construction," but leaving the commission free to allow recovery when that process is over.

The company's position is untenable. The statute does not use "construction work in progress" in a technical accounting sense. Moreover, the second sentence does not use the term at all and is not restricted by any temporal limitation CWIP may carry. Nor is there any persuasive basis for reading the phrase "at no time . . . if . . . construction work is not completed" in the second sentence of the statute to mean "at no time before construction work is abandoned," which would be necessary on the company's view.

■ We will examine these points in greater detail, beginning with the first premise of the company's argument, that the statute uses "construction work in progress" in a technical accounting sense meaning "balances of work orders for electric plant in process of construction." The text of the statute is simply inconsistent with this reading. If the statute used the term to mean a balance of work orders, its first and third sentences would forbid the basing of rates on the "cost" of the balance of work orders. A balance of work orders records or represents a cost, and it would be pointlessly redundant for the statute to speak of a cost of a cost. Still less would it make sense to speak, as the third sentence does, of the costs of CWIP as including the costs of "constructing" or "owning" construction work in progress. A company does not construct or own a balance of work orders. It constructs and owns physical plants, and uncompleted physical plants are what the statute must mean by "construction work in progress."

■ Even on our view that the statute uses "construction work in progress" to refer to the physical plant, the company could still argue that prohibitions dealing with "construction work in progress" could apply only during the period when the work was "in progress," and would not apply after the work had been abandoned. This argument has no bearing on the interpretation of the second

sentence of the statute, however, since this sentence forbids basing rates on uncompleted "construction work," not on "construction work in progress." The company has cited no authority indicating that "construction work" is either synonymous with "construction work in progress" or a term of art in its own right. Taking it, rather, in its common sense referring to a physical structure, it carries no suggestion that it refers to uncompleted construction work only before, but not after, abandonment.

Lastly, we note the difficulty for the company's position created by the provision in the second sentence that "[a]t no time" should rates be based on costs associated with construction work if the work "is not completed." The company argues that "completed" merely means "ended" rather than "concluded upon reaching its desired objective." On this view, abandoned work would be "completed," and the prohibition would no longer apply. Three walls open to the sky would be "completed" construction work. "At no time" would merely mean at no time before abandonment.

■ This reading would be hard for the criterion of common usage to bear. But if we were to accept it for the sake of its ingeniousness, we would simply run up against a new interpretative problem. For if the company were right, the second sentence would be unnecessary. If "construction work" in the second sentence merely meant "construction work that has not been stopped," it would mean "construction work in progress." No other variation in the language of the two sentences offers any apparent escape from the redundancy created by the company's reading, which must therefore fall beneath the customary presumption that the legislature does not waste words or enact redundant provisions. *Appeal of Village Bank & Trust Co.*, 124 N.H. 492, 495, 471 A.2d 1187, 1189 (1984); *Blue Mountain Forest Ass'n v. Town of Croydon*, 117 N.H. 365, 373 A.2d 1313 (1977).

While the language of the second sentence cannot sustain the weight of the company's position, the difficulties disappear when we read it according to common usage. Though it does not speak expressly of "abandonment," the period of abandonment clearly falls within the scope of the prohibition that "[a]t no time shall any rates or charges be based upon any costs associated with construction work if said construction work is not completed."

■ "At no time" means just what it appears to mean. Construction work on an abandoned plant is construction work that is "not completed." The investment in such an uncompleted and abandoned plant is a cost "associated" with its uncompleted construction work. Recovery of an investment by revenue raised through rates would

require that the rate be based on such a cost. Therefore, the statute simply forbids recovery of such investment through rates.

■ It is not difficult to apply this conclusion to the first two issues raised by the question transferred. Since the terms of the prohibitory language are unqualified, it is clear that they forbid both the amortization of the investment as an expense and the inclusion of the investment, or any unamortized portion of it, in the rate base.

■ Particular care is called for, however, in considering the application of the second sentence to the third issue, involving the commission's authority over the rate of return. It is clear that the commission could not simply increase the rate of return for the purpose of producing the same revenue over the same period of time that might be produced if the investment were amortized as an expense. This would merely be a recovery of investment by less direct means than expense or rate base treatment.

■ ■ We cannot determine on the present record, however, the extent, if any, to which the lost investment may justify an increase in the rate of return for the purpose of attracting new capital. It is easy to argue that any increase in the rate of return will allow at least partial recovery of lost investment. But it does not follow from this alone that the statute precludes such a result if it is necessary to attract such investment as the commission may find to be required in the future. We will not attempt in the abstract to draw the line between an increase in rate of return that produces an indirect and impermissible recovery, on the one hand, and one that is arguably necessary to attract investment essential to future operations, on the other. The difficulty of drawing this distinction is illustrated by the contrast between the majority and dissenting opinions in *Consumers' Counsel v. Pub. Util. Comm.*, 4 Ohio St. 3d 111, 447 N.E.2d 749 (1983). Indeed, the parties have not even raised the issue whether such a distinction is permissible under our statute. We therefore must leave open the extent, if any, to which the rate of return may be increased to reflect the risk that the statute places on investors when a plant is abandoned.

Since we have reached these conclusions without finding any ambiguity in the applicable provisions, we have no occasion to look to legislative history as an aid to statutory construction. *See Greenhalge v. Dunbarton*, 122 N.H. at 1040, 453 A.2d at 1296. We have nonetheless examined the entire legislative history not only of RSA 378:30-a (Supp. 1981), but also of the four other bills that would have affected the treatment of CWIP. We have found nothing incon-

sistent with the plain reading that we have given to the second sentence of the bill that the legislature passed. We find instead that the first of all the bills on the subject, 1977 H.B. 986, would have enacted a provision of one sentence with much of the language of the present sentences one and three but precluding only treatment of CWIP in the rate base. That original bill was amended into the language of the present statute. N.H.H.R. JOUR. 627 (1977). The amended language was carried forward through 1978 H.B. 5 and 1979 H.B. 155, and was finally enacted as Laws 1979, 101:1, adding RSA 378:30-a (Supp. 1981). This history indicates that there was a considered intention to broaden the scope of the original prohibition in the manner reflected in the foregoing analysis.

Just as the clarity of the statute rules out the need to rely on legislative history in its interpretation, so it leaves much of the parties' argument and citation of authority inapplicable to the issues before us. For example, we decline to address the company's claim that a policy against retrospectivity should affect the meaning given to the statute's terms. Since the statute is clear on the issues before us, retrospectivity may be considered, if at all, only in a constitutional adjudication for which we have already found the record insufficient on this interlocutory transfer.

So, too, we have not relied upon authority from outside this jurisdiction. To our knowledge, no other State has a statute identical to this one. Therefore cases from other jurisdictions are not on point, whether they construe their local statutes favorably to the shareholders' interests, *e.g.*, *Pa. Pub. Util. Comm. v. Duquesne Light Co.*, 52 PUR 4th 644 (1983), or whether they interpret them to reach the result that our statute requires. *E.g.*, *Re Union Electric Co. of St. Louis*, 57 PUR 4th 169 (1983).

Least of all is authority persuasive from jurisdictions that have left the consequences of abandonment, like the issue of dealing with CWIP itself, subject to the general regulatory discretion of their utilities commissions. The most notable instance of such treatment comes from Massachusetts, where the Supreme Judicial Court sustained the commission's decision to allow recovery of a portion of Boston Edison Company's investment in Pilgrim 2. *Attorney General v. Dept. of Pub. Utilities*, 390 Mass. 208, 455 N.E.2d 414 (1983).

Nor is it relevant that the result in Massachusetts accords with the result in the overwhelming majority of other jurisdictions. *See Counsel v. P.U.C.*, 67 Ohio St. 2d 153, 423 N.E.2d 820 (1981), *appeal dismissed*, 455 U.S. 914 (1982); *see generally*, Wilson, *Ratemaking Treatment of Abandoned Generating Plant Losses*, 8 WM. MITCHELL L. REV. 343 (1982); Sommers, *Recovery of Electric Utility Losses From Abandoned Construction Projects*, 8 WM. MITCHELL L. REV.

363 (1982); Note, *Public Utilities: The Black Fox Nuclear Project Cancellation Dilemma of Judicial Review and Reform of Oklahoma's Administrative Process*, 36 OKLA. L. REV. 190 (1983). The legislature of Massachusetts has left its commission with the delegated discretion to determine the policy on investment in cancelled plants. The legislature of New Hampshire divested its commission of any discretion in this matter when it passed RSA 378:30-a (Supp. 1981). Thus, on the issues concluded by this opinion, the commission has no more authority to consider policy than this court has to pass upon the advisability of enacting the statute or of leaving it on the books.

*Remanded.*

All concurred.