Public Utilities Commission
No. 84-380

## APPEAL OF SINCLAIR MACHINE PRODUCTS, INC. & a.
### (New Hampshire Public Utilities Commission)

July 26, 1985

*Myers and Laufer*, of Concord (*David W. Jordan* on the brief and orally), for the appellants Sinclair Machine Products, Inc. *& a.*

*Ransmeier & Spellman*, of Concord (*Steven E. Hengen*) and *Donald L. Rushford*, of Rutland, Vermont (*Mr. Hengen* and *Mr. Rushford* on the brief, and *Mr. Rushford* orally), for Connecticut Valley Electric Company.

*Orr & Reno*, of Concord (*Richard B. Couser* on the brief), by brief for Granite State Electric Company, as amicus curiae.

BATCHELDER, J.   This is an appeal of a New Hampshire Public Utilities Commission (PUC) decision of June 18, 1984, approving a rate increase for Connecticut Valley Electric Company (CVEC). CVEC, a New Hampshire utility company providing retail service to New Hampshire customers, is wholly owned by a Vermont corporation, Central Vermont Public Service Corporation (Central Vermont). CVEC purchases the vast bulk of its power at wholesale from Central Vermont. Its other power is supplied by local small power producers.

The rate paid by CVEC to Central Vermont for this wholesale power purchase was approved by the Federal Energy Regulatory Commission (FERC) pursuant to its authority under the Federal Power Act, 16 U.S.C. § 824 *et seq.* The rate itself is actually a part of a comprehensive agreement denominated Central Vermont "Rate RS-2." As approved by the FERC on February 1, 1982, the RS-2 rate sets the price at which Central Vermont will sell its wholesale power to CVEC, the terms under which that power will be supplied, provisions for termination of the agreement, and other mutual obligations of CVEC and Central Vermont respecting their relationship in the wholesale power transaction.

Approval of the RS-2 rate by the FERC on February 1, 1982, was based on a proposed unilateral settlement agreement submitted by Central Vermont. The proposed settlement was unopposed. The FERC approved the settlement as being in the public interest conditioned upon its not receiving adverse comment during the time period for such comment under its rules, and pointed out that its acceptance of the settlement "does not constitute approval of or precedent regarding any principle or issue in this proceeding."

Among the costs which the FERC allowed Central Vermont to recover through the RS-2 rate were the costs of Central Vermont related to its investment in the abandoned Pilgrim II and Montague nuclear power plants.

Appellants Sinclair Machine Products, Inc. & a. (Sinclair), all retail customers of CVEC, intervened in CVEC's retail rate proceeding initiated before the PUC in July, 1983. Relying on the State's anti-CWIP statute, RSA 378:30-a, Sinclair opposed CVEC's attempt to recover through its retail rates that part of CVEC's power costs which reflected a pass-through of Central Vermont's cost of the abandoned Pilgrim II and Montague nuclear plants. The PUC held that the FERC's approval of the RS-2 rate preempted the PUC from examining the reasonableness of the wholesale rate and required that the costs associated with that wholesale purchase be allowed as a reasonable operating expense of CVEC which can be passed along to New Hampshire retail customers. This appeal followed. We reverse and remand. We hold that federal preemption of State authority requires that the wholesale rate fixed by the FERC binds the PUC, to the extent that the PUC may not disapprove such a rate even in light of the State's anti-CWIP statute. However, the PUC may always inquire into the reasonableness of a utility's purchasing power under a FERC-approved rate, given other purchase options available to the utility.

The central question before the PUC in a retail rate case such as this is whether costs incurred under a wholesale rate, which has been approved as being a just and reasonable *charge* by the wholesaler, are just and reasonable *operating expenses* of the retail utility. If those costs are just and reasonable, then the retailer, CVEC, must be allowed to recover them through its rates to New Hampshire retail customers. *See* RSA 378:7.

The PUC never reached this question. It observed that the FERC had approved the wholesale rate charged by Central Vermont as being just and reasonable. The PUC then ruled that it was preempted from questioning the reasonableness of this rate. It further ruled that it had to "deem a FERC approved wholesale rate as a reasonable operating expense, even when that rate includes a CWIP element in violation of the New Hampshire legislation."

The PUC correctly determined under federal preemption principles that FERC approval of a wholesale rate precludes the PUC from questioning the *reasonableness of that charge.* However, it does not follow *automatically* that the PUC must find that power costs incurred under a wholesale rate are *necessarily* a *reasonable expense for the retailer.* The PUC stated expressly that it did not consider whether CVEC had alternatives to purchasing power from Central

Vermont under the RS-2 rate and whether the purchases were reasonable. We must, therefore, remand this case to the PUC for additional findings before CVEC's burden of showing the reasonableness of this expense can be found to have been met.

We begin our analysis by examining New Hampshire law. RSA 378:30-a, the State's "anti-CWIP" law, provides:

> "Public Utility Rate Base; Exclusions. Public utility rates or charges shall not in any manner be based on the costs of construction work in progress. At no time shall any rates or charges be based upon any costs associated with construction work if said construction work is not completed. All costs of construction work in progress, including, but not limited to, any costs associated with constructing, owning, maintaining or financing construction work in progress, shall not be included in a utility's rate base nor be allowed as an expense for rate making purposes until, and not before, said construction project is actually providing service to consumers."

In *Appeal of Public Service Co. of New Hampshire*, 125 N.H. 46, 480 A.2d 20 (1984), we held that this statute barred recovery through rates of the cost of abandoned plant. The statute "forbid[s] both the amortization of the investment as an expense and the inclusion of the investment, or any unauthorized portion of it, in the rate base." *Id.* at 55, 480 A.2d at 25.

The FERC, however, has applied a different rule in setting the wholesale rate in this case. *See* 18 C.F.R. 35.26 (allowing CWIP in rate base). Costs related to the abandonment of the Pilgrim II and Montague plants have been allowed by the FERC in determining the RS-2 rate. Moreover, this rate is set pursuant to an expansive federal regulatory process designed to implement very substantial federal interests in the field of energy supply and distribution. Therefore, our attention must focus on the doctrine of federal preemption of State action in order to determine what jurisdiction, if any, the PUC may exercise with respect to the wholesale power cost of CVEC in this retail rate case.

■ Federal preemption doctrine is based upon article VI of the United States Constitution, which declares federal law to be the supreme law of the land:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land;

and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding."

■■ As to matters involving interstate commerce in the federal domain, "Congress may, if it chooses, take unto itself all regulatory authority . . . , share the task with the States, or adopt as federal policy the state scheme of regulation. The question in each case is what the purpose of Congress was." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 229–30 (1947) (citations omitted). Where Congress has legislated in a field traditionally occupied by the States, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 230.

■ Congress may manifest its purpose in several ways. *Id.*

> "Absent explicit preemptive language, Congress [sic] intent to supersede state law altogether may be found from a 'scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' 'because the Act of Congress may touch a field in which the *federal interest is so dominant* that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or 'because the *object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose.*' . . . *Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law.* Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' . . . or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"

*Exxon Corp. v. Eagerton*, 462 U.S. 176, 182 (1983) (citations omitted) (emphasis added). "[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police powers of the States." *Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n*, 461 U.S. 375, 377 (1983); *see also Northern States Power Co. v. Hagen*, 314 N.W.2d 32, 36 (N.D. 1981). Therefore, congressional purpose to preempt State regulation of retail utility rates will not be presumed, but must be manifest or clear from the federal scheme.

We turn our analysis to an examination of the federal regulatory policy. Congress has declared:

> "that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter [16 U.S.C. § 824 through § 825u] and of that part of such business *which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.*"

16 U.S.C. § 824(a) (emphasis added).

The statute then delineates the scope of federal jurisdiction as follows:

> "The provisions of this subchapter [16 U.S.C. § 824 *et seq.*] shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but shall not apply to any other sale of electric energy."

16 U.S.C. § 824(b). Electric energy is defined as transmitted in interstate commerce, "if transmitted from a State and consumed at any point outside thereof . . . ." 16 U.S.C. § 824(c). A "'sale of electric energy at wholesale' . . . means a sale of electric energy to any person for resale." 16 U.S.C. § 824(d).

The scope and purpose of federal regulation in this area has been stated as follows:

> "In 1935, Congress enacted Part II of the Federal Power Act, 16 U.S.C. §§ 824–824k (1976 ed. and Supp. IV), which delegated to the Federal Power Commission, now the Federal Energy Regulatory Commission, exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce, without regard to the source of production . . . . The 1935 enactment was a 'direct result' of this Court's holding in *Public Utilities Comm'n v. Attleboro Steam & Electric Co., supra,* that the states lacked power to regulate the rates governing interstate sales of electricity for resale . . . . Part II of the Act was intended to 'fill the gap' created by *Attleboro* by establishing exclusive federal jurisdiction over such sales."

*New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982).

█ It is clear, therefore, that the Federal Power Act envisioned both State and federal participation in regulating electric power in its totality—from wholesale electric power supply and transmission to retail distribution. The respective jurisdictions of the State and federal regulatory agencies, however, were not to be determined on a case-by-case basis. *F.P.C. v. Southern Cal. Edison Co.*, 376 U.S. 205, 215–16 (1964). Rather, the distinction between State and federal jurisdiction under the act was to be a "bright line," in accordance with which federal regulation will control wholesale transactions or sales in interstate commerce, and States will regulate retail sales. *Id.; see Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n*, 461 U.S. at 379–80. "'The line of the statute was . . . clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses.'" *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n*, 332 U.S. 507, 517 (1947); *cf. Exxon Corp. v. Eagerton*, 462 U.S. at 185–87 (under Natural Gas Producers Act, though Alabama was preempted from prohibiting pass-through of State severance tax by *interstate* producers, it could prohibit pass-through by producers operating strictly within the state).

█ The "bright line" distinction becomes blurred, however, where federal regulators determine that they will not regulate certain aspects of electric generation or ratemaking. *See Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n, supra* at 383–85. In such instances, State regulation may fill the gap to the extent (1) that federal determinations are not intended as a policy to leave the matter unregulated and (2) that, consistent with the Commerce Clause, the State regulation would not unreasonably burden interstate commerce. *See id.* at 384–85.

Our analysis, therefore, advances to a consideration of potential conflicts or inconsistencies with the federal interests in the area of interstate wholesale electric ratemaking which would arise if the State, in setting the retail rates, either were to disallow certain costs incurred under wholesale rates or were to inquire into the reasonableness of the retailing utility's incurring such costs.

The highest courts of the States which have considered whether their utilities commissions may inquire into the reasonableness of wholesale rates fixed by the FERC have answered that they cannot. *See, e.g., Narragansett Electric Co. v. Burke*, 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied*, 435 U.S. 972 (1979); *Eastern Edison Co. v. Department of Public Utilities*, 388 Mass. 292, 446 N.E.2d 684

(1983); *Northern States Power Co. v. Minn. P.U.C.*, 344 N.W.2d 374 (Minn.), *cert. denied*, 104 S. Ct. 3546 (1984); *Northern States Power Co. v. Hagen*, 314 N.W.2d 32 (N.D. 1981).

Were the PUC selectively to inquire into the reasonableness of Central Vermont's costs and disallow a pass-through of those costs in setting CVEC's retail rates, two problems would result. First, Central Vermont, the wholesaler under exclusive FERC jurisdiction, would be required to justify its costs a second time. Such a result defeats part of the federal objective of providing orderly and streamlined procedures for approval of wholesale transactions. Second, CVEC would face costs which it *lawfully incurred and was obligated to pay* under the RS-2 rate, but which it was barred from recovering from its customers under State law. The result would be a dilution of CVEC's return on investment. Such a dilution of return on investment would be a substantial inducement to CVEC to breach its obligation under the RS-2 rate or to seek alternatives to the arrangement. The alternatives which CVEC would seek would be those based not on the public interest, but on which alternative arrangement would best prevent dilution of its fair return. Such a result was not intended by a federal regulatory scheme which provides a federal forum for structuring interstate wholesale sales in the public interest. Furthermore, we note, though we do not here decide, that such a policy might also be confiscatory and therefore invalid. *See Appeal of Gas Service, Inc.*, 121 N.H. 602, 431 A.2d 795 (1981); *cf. Pike Cty. Light & Power v. Pennsylvania*, 465 A.2d 735, 739 (Pa. Commw. Ct. 1983) (finding no confiscation).

■ Accordingly, the PUC is preempted from selectively disallowing portions of CVEC's cost of wholesale power which reflect Central Vermont's cost of abandoned plant. To the extent that our State's anti-CWIP statute, RSA 378:30-a, as interpreted in *Appeal of Public Service Company of New Hampshire*, 125 N.H. 46, 480 A.2d 20 (1984), would bar recovery of costs of abandoned plant in the *absence* of a federal regulatory presence, that rule is preempted in the context of this case.

The remaining question is whether the PUC may inquire into the prudency of CVEC's participation in this arrangement with Central Vermont in light of alternatives available to CVEC. A modern trend has emerged by which State utilities commissions, without undermining the FERC's determination of the reasonableness of the wholesale rate, may limit recovery of the retailer's expenses incurred under that rate. *See Pike Cty. Light & Power v. Pennsylvania supra; Spence v. Smyth*, 686 P.2d 597 (Wyo. 1984); *Application of Commonwealth Electric Co.*, Massachusetts Department of Public

Utilities, Docket No. 84-3B-2 (May 10, 1984); J. Pfeffer and W. Lindsay, *The Narragansett Doctrine: An Emerging Issue in Federal-State Electricity Regulation,* THE NATIONAL REGULATORY RESEARCH INSTITUTE OF THE OHIO STATE UNIVERSITY at 34–37, 45–46 (Dec. 1984).

In *Pike County,* the court observed:

> "In carrying out its regulatory function, the FERC examines the cost of service data of [the interstate wholesaler] to determine that its wholesale rates provide a fair return to the utility's stockholders without being unfair to [the wholesaler's] purchasers. *The FERC does not analyze the [retailer's] cost of service data or purchased power alternatives in making its determination.* The FERC focuses on [the wholesaler] to determine whether it is just and reasonable *for that company to charge* a particular rate, but makes no determination of whether it is just and reasonable for [the retailer] *to incur* such a rate as an expense. The PUC, on the other hand, has no jurisdiction to analyze [the wholesaler's] cost of service data and makes no determination as to the reasonableness for [the wholesaler] to charge its rates. The PUC focuses on [the retailer] and its cost of service data to determine whether it is reasonable for [the retailer] to incur such costs in light of available alternatives."

*Pike Cty. Light & Power v. Pennsylvania,* 465 A.2d at 738 (citing 18 C.F.R. 35.13) (emphasis added). From this analysis, *Pike County* concluded:

> "[W]hile the FERC determines whether it is against the public interest for [the wholesaler] to charge a particular rate in light of its costs, the PUC determines whether it is against the public interest for [the retailer] *to pay a particular price in light of its alternatives.* The regulatory functions of the FERC and the PUC thus do not overlap, and there is nothing in the federal legislation which preempts the PUC's authority to determine the reasonableness of a utility company's claimed expenses. In fact, we read the Federal Power Act to expressly preserve that important state authority."

*Id.* (emphasis added).

*Pike County* held that the PUC could compare the FERC-approved wholesale rate with other alternatives available to the utility and disallow costs incurred in excess of the available alterna-

tives. FERC determinations are not called into question, and the integrity of the FERC rate is preserved.

The FERC has highlighted the limits of its own review of wholesale power purchase contracts from the perspective of the retailing purchaser in two recent opinions. The FERC stated:

> "We wish to make it clear that our decision to accept the contract . . . does not, in our view, bind us or the Pennsylvania Public Utility Commission to any particular treatment of these items in the cost of service for wholesale and retail requirements customers of [the purchasers]. Further, our decision to accept the contract rate and service arrangement is not predicated on a determination that, over the initial term of the contract, [the purchasing company] could have done no better buying from someone else, or that the transaction over this period will redound to the benefit of the retail and wholesale customers of the two respective parties to the contract. It does appear that [the purchasing company's] other customers will realize a net benefit from this transaction over the initial term of the contract; but we do not mean by this order to prejudge, for our own purposes or those of the respective state commissions, a determination of the prudence of either party in entering into this transaction."

*Application of Commonwealth Electric Co., op. cit.* at 19 (quoting *Philadelphia Electric Co.,* 15 FERC para. 61,264, 61,601 (1981)).

Citing the above quoted paragraph, the FERC has stated further that "our decision to accept the agreement for filing is premised on the fact that the formula rate for this jurisdictional sale will not produce excessive revenues. Our decision is not, however, based on a determination that the [purchaser's] purchase is prudent." *Application of Commonwealth Electric Co., op. cit.* at 19–20 (quoting *Pennsylvania Power & Light Co.,* 23 FERC para. 61,006, 61,009 (1983)).

The Massachusetts Department of Public Utilities concluded on the basis of the above cited authority that:

> "In reviewing a filing in accordance with [its] regulations, the FERC requests no information, and does not make any determination, concerning a potential purchaser's decision to acquire the power, decision to enter a contract, decision to make a particular purchase, or the availability to the purchaser of less expensive or more efficient alternatives to this particular wholesale purchase. The regulations are aimed solely at the cost structure of and alternatives available to the seller."

*Application of Commonwealth Electric Co., op. cit.* at 21.

■■ The approach of this modern trend, which we here adopt and approve as being consistent with preemption doctrine applicable to State regulation of retail electric rates, is to examine those matters *actually determined,* whether expressly or impliedly, by the FERC. As to those matters not resolved by the FERC, State regulation is *not preempted provided that* State regulation would not contradict or undermine FERC determinations and federal interests, or impose inconsistent obligations on the utility companies involved.

We therefore turn to a close examination of the scope of FERC approval in this particular case. The FERC defines the term "rate schedule" broadly to include not only rates and charges for electric service, but also "all classifications, practices, rules, regulations or contracts which in any manner affect or relate to the aforementioned service rates and charges." 18 C.F.R. 35.2(b) (1983); *see Northern States Power Co. v. Minn. P.U.C.,* 344 N.W.2d at 380; 16 U.S.C. § 824d(c). Thus, a FERC "rate" for wholesale power supply can be much more than merely an *offer of terms* or schedule of charges under which the wholesaler will make power available to a willing buyer.

In fact, the RS-2 rate in this case is a complex and comprehensive agreement between CVEC and Central Vermont. Both the RS-2 rate and the FERC's acceptance of it were part of the record before the PUC. The RS-2 rate document states as follows:

> "Connecticut Valley Electric Company, Inc. ('the customer'), *by commencing to take reserve system capacity service from Central Vermont Public Service Corporation* (the 'Company'), agrees to take and pay for, and the Company agrees to furnish the service, subject to the terms of this rate schedule . . . ."

Rate RS-2, Part A, Obligation of the Parties (emphasis added). The agreement then provides that Central Vermont shall meet CVEC's electric power requirements for a specific period at an approved rate and specifies the engineering standards to govern the power supply. The rate further provides that the parties may terminate the agreement upon one year's notice to the other party.

Implicit in the RS-2 rate is a FERC determination that CVEC and Central Vermont are separate legal entities at least for the purposes of this wholesale transaction. Second, the rate *charged* for this purchase, including costs for abandoned plant, is just and reasonable based on the FERC's evaluation of *Central Vermont's* legitimate costs and investment. Third, the obligations of the two parties bound

by the rate schedule are "in the public interest." *See* FERC approval of RS-2 rate by letter of Kenneth A. Plumb, Secretary of the FERC.

■ The PUC is preempted from disallowing CVEC's recovery of that portion of its wholesale power costs representing a flow-through of plant abandonment costs. Such an inquiry would invade the integrity of the FERC's determinations. This case is thus distinguished from *Pike County*, where the FERC rate alternative was compared in its entirety against other available options and only the excess cost of the FERC rate option was disallowed.

■ Nevertheless, neither the RS-2 rate nor the FERC approval of that rate explicitly conclude that participation in the agreement is in CVEC's or its customers' best interest. The RS-2 rate is expressly conditioned on CVEC's commencing to take power from Central Vermont. If and only if CVEC undertakes to use Central Vermont's reserve system capacity do the RS-2 rate and its attendant obligations come into effect. Even after the rate becomes effective, CVEC may terminate the arrangement in accordance with the terms specified in the RS-2 rate. A PUC inquiry into CVEC's participation under the terms of the RS-2 rate would be entirely consistent with the obligations imposed on Central Vermont and CVEC by the RS-2 rate. There is, at least facially, no burden placed upon interstate commerce by such an inquiry, so long as no special preference is afforded to in-State versus interstate alternatives available to CVEC. *See New England Power Co. v. New Hampshire*, 455 U.S. at 338–39; *Application of Commonwealth Electric Co., op. cit.* at 29. Thus, the PUC is not preempted from determining the reasonableness or prudency of CVEC's initial purchase of Central Vermont power or its continued participation under this rate schedule.

■ Given that the PUC is not preempted from an inquiry into alternatives to the RS-2 rate, the question becomes whether CVEC's participation under the RS-2 rate is reasonable. The burden of showing the reasonableness of CVEC's participation in this agreement rests with CVEC. *See* RSA 378:8; *LUCC v. Public Serv. Co. of N.H.*, 119 N.H. 332, 345, 402 A.2d 626, 635 (1979). That burden is not satisfied merely by submitting evidence of FERC approval of the RS-2 rate, where that approval fails to address the reasonableness of CVEC's participation. The wholesale rate must be justified by the utility as the product of reasonable efforts to secure the lowest cost in light of appropriate alternatives available to the company. *See Application of Commonwealth Electric Co., op. cit.* at 29–32.

This burden was not met in this case. The PUC stated:

"We are not addressing here our authority to review whether a distribution utility acted properly when it agreed to purchase power from a particular wholesaler. That issue has not been raised in this case. Thus, our conclusion herein assumes that the decision to enter into a purchase power transaction with a particular wholesaler was a reasonable and proper exercise of managerial discretion."

This assumption by the PUC overlooks CVEC's underlying burden of proof in this case and abdicates the PUC's responsibility for approving only those rates it finds to be just and reasonable. On remand, the PUC must make determinations in accordance with this opinion.

■■■ In light of the need for new proceedings, we will take this opportunity to offer further guidance in the interest of judicial economy. In this appeal, Sinclair argues that the FERC never actually approved the wholesale rate charged by Central Vermont to CVEC, but merely allowed the rate filing to take effect following a settlement. The PUC correctly concluded that the quality of FERC proceedings in approving rates filed with it is not a matter for the PUC to question. *See Eastern Edison Co. v. Department of Public Utilities*, 388 Mass. 292, 304–05, 446 N.E.2d 684 (1983). Those issues must be raised, if at all, before the FERC.

Sinclair has also raised allegations related to the parent/subsidiary relationship existing between Central Vermont and CVEC. It argues that the corporate veil of CVEC should be pierced to prevent a flow-through of the nuclear plant abandonment costs and that CVEC breached a fiduciary duty to its customers by not objecting to Central Vermont's wholesale rate in the ratemaking proceeding before the FERC. Such matters, while reflecting upon the prudency of CVEC in incurring wholesale power costs, are within the FERC's domain of fixing the wholesale rate between these parties. "'There is nothing to suggest that the [Federal Power Commission, now the FERC] will not closely scrutinize this [parent/subsidiary] relationship, for the statutory purpose of protecting the public and consumers from exploitation.'" *Narragansett Elec. Co. v. Burke*, 119 R.I. at 567, 381 A.2d at 1362–63 (quoting *United Gas Corp. v. Mississippi Pub. Serv. Comm'n*, 240 Miss. 405, 442, 127 So. 2d 404, 420 (1961)).

*Reversed and remanded.*

All concurred.