USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1629

 PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, ET AL.,

 Plaintiffs, Appellees,

 and

 CONNECTICUT VALLEY ELECTRIC COMPANY and
 CENTRAL VERMONT PUBLIC SERVICE CORPORATION,

 Plaintiffs/Intervenors, Appellees,

 v.

 DOUGLAS L. PATCH, CHAIRMAN OF THE STATE OF NEW HAMPSHIRE
 PUBLIC UTILITIES COMMISSION, ET AL.,

 Defendants, Appellants.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Ronald R. Lagueux, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
Bownes and Reavley, Senior Circuit Judges.

 Dennis Lane with whom Michael E. Tucci and Morrison & Hecker,
L.L.P. were on brief for defendants Douglas L. Patch, Bruce B.
Ellsworth and Susan S. Geiger.
 Sarah B. Knowlton, Steven V. Camerino and McLane, Graf,
Raulerson & Middleton, P.A. on brief for City of Claremont, New
Hampshire, Amicus Curiae.
 Douglas W. Smith, General Counsel, John H. Conway, Deputy
Solicitor, and Deborah B. Leahy on brief for Federal Energy
Regulatory Commission, Amicus Curiae.
 Philip T. McLaughlin, Attorney General, Martin P. Honigberg,
Senior Assistant Attorney General, Civil Bureau, James K. Brown,
John A. Shope and Foley, Hoag & Eliot LLP on brief for Jeanne
Shaheen, Governor of the State of New Hampshire, Amicus Curiae.
 F. Anne Ross and F. Anne Ross, P.C. on brief for Retail
Merchants Association of New Hampshire, New Hampshire Office of the
Consumer Advocate, Campaign for Ratepayers Rights, Community Action
Program, City of Manchester and Cabletron Systems, Inc., Amici
Curiae.
 Lee A. Freeman, Jr., and Allan B. Taylor with whom John F.
Kinney, James T. Malysiak, Glynna W. Freeman, Freeman, Freeman &
Salzman, P.C., Joseph M. Kraus, Vice President and General Counsel,
Central Vermont Public Service Corporation, Dom S. D'Ambruoso,
John T. Alexander, Ransmeier & Spellman, John B. Nolan, Allan B.
Taylor, Gary M. Becker, Robert W. Clark and Day, Berry & Howardwere on brief for appellees Connecticut Valley Electric Company,
Central Vermont Public Service Corporation, Public Service Company
of New Hampshire, North Atlantic Energy Corporation, Northeast
Utilities and Northeast Utilities Service Company.

December 3, 1998

 
 

 BOUDIN, Circuit Judge. On this appeal, we consider
whether the district court properly enjoined a state utility
commission to allow a specific increase in electric utility rates
sought by Connecticut Valley Electric Service Company ("Connecticut
Valley"). In timing and background facts, there is considerable
overlap between this decision and our companion decision today in
No. 98-1764, which arises out of the same district court
proceeding. The reader's familiarity with that decision is
assumed, but additional background is required to understand the
events and legal issues peculiar to Connecticut Valley.
 I. BACKGROUND
 Connecticut Valley is an electric utility that provides
retail service to end-user customers in certain New Hampshire
communities. Its rates are set forth in a retail tariff subject to
the authority of the New Hampshire Public Utilities Commission
("the Commission"). R.S.A. 378:7 (1997); see Legislative Util.
Consumers' Council v. Public Serv. Co., 402 A.2d 626, 631 (N.H.
1979). The company does not generate any electric power; it is
part of an integrated public utility system and purchases power
from others.
 About 76 percent of the power purchased by Connecticut
Valley is acquired from its parent company, Central Vermont Public
Service Company ("Central Vermont"). Rates and contracts for
wholesale transactions in electric power, assuming an interstate
nexus, are normally subject to regulation by the Federal Energy
Regulatory Commission ("FERC") under the Federal Power Act, 16
U.S.C. 824, 824d (1994). FERC has accepted for filing the
tariffs and contract under which Central Vermont supplies power to
Connecticut Valley. See Appeal of Sinclair Mach. Prods., Inc., 498
A.2d 696, 698-99 (N.H. 1985). 
 In supplying Connecticut Valley and its own retail
customers in Vermont, Central Vermont purchases about 35 to 40
percent of its power under a long-term supply contract with Hydro
Quebec. Contracts of this kind provide price and supply protection
(the Hydro Quebec contract runs until 2016), but also commit the
purchaser to buy even if market conditions change. Apparently, the
Hydro Quebec contract price now exceeds wholesale electricity
prices available in New England, so Connecticut Valley could lower
its power costs in the short run if it ceased to buy from Central
Vermont.
 The existing contract between Connecticut Valley and
Central Vermont permits Connecticut Valley to terminate its
purchase contract on short notice; oversimplifying slightly, the
notice period is one year. Although Connecticut Valley says that
the Commission initially encouraged its contract with Central
Vermont, the Commission has recently criticized the purchases,
saying that the contract was being continued for the benefit of
Central Vermont and that the purchases could be regarded as
imprudent from Connecticut Valley's standpoint.
 In February 1997, when adopting the Final Plan discussed
in our companion decision, the Commission's implementing order as
to Connecticut Valley addressed the issue directly. See Order No.
22,509. The Commission's order said that in calculating the costs
that Connecticut Valley would be able to recover through its own
retail rates, the Commission would disallow the cost of power
acquired from Central Vermont to the extent that it exceeded the
cost of power generally available at wholesale prices in
Connecticut and in New Hampshire. See id. 
 Central Vermont responded in June 1997 by initiating a
proceeding before FERC to terminate the contract with Connecticut
Valley; the request for termination, however, was contingent on
FERC's approval of a termination charge by which Central Vermont
could effectively impose upon Connecticut Valley a share of the
"loss" resulting from the difference between the long-term Hydro
Quebec rate and the lesser market rate now available. FERC
rejected the Central Vermont proposal, but invited Central Vermont
to return to FERC with a differently structured plan for making
Connecticut Valley share in some measure in whatever loss resulted
from termination. 
 The next event leading to the present appeal occurred in
Fall 1997, when Connecticut Valley submitted tariff changes to the
Commission to secure an increase in Connecticut Valley's own retail
rates. The purpose of the proposed increase, sought to be made
effective on January 1, 1998, was simply to pass through to
customers increases in Central Vermont's wholesale rate under its
FERC tariff. It appears that the rate charged to Connecticut
Valley depended on Central Vermont's own costs of generating and
acquiring power, which vary from year to year. The Commission had
previously allowed Connecticut Valley to make corresponding
increases in its retail rates without much fuss or delay.
 This time the story was different. The Commission
announced on December 31, 1997, that it would not allow Connecticut
Valley to increase its retail rates to take account of the increase
in Central Vermont's wholesale rate charged to Connecticut Valley. 
See Order No. 22,815. The Commission's order acknowledged that
this would cause a shortfall for Connecticut Valley, but it said
that the utility should earlier have terminated its contract with
Central Vermont. The Commission said it would later determine what
prudently acquired wholesale power should cost Connecticut Valley,
creating the threat of an actual decrease in Connecticut Valley's
retail rates.
 On January 19, 1998, Connecticut Valley and Central
Vermont filed a motion in the district court in the pending
litigation brought by Public Service Company of New Hampshire
("PSNH"), described in our companion opinion. Connecticut Valley
and Central Vermont, along with other utilities in New Hampshire,
had already intervened in that case. See Public Serv. Co. v.
Patch, 173 F.R.D. 17 (D.N.H. 1997). In their motion, Connecticut
Valley and Central Vermont sought a temporary restraining order and
then a preliminary injunction to require the Commission to put into
effect the rate increases that the Commission had disallowed in
December 1997.
 In the TRO motion, the two utilities argued that the
Commission's rejection of the rate increases effectively violated
the injunction against the Final Plan previously obtained by PSNH,
and further argued that, independent of the district court's prior
orders, the Commission's December 31, 1997, order was "preempted"
by FERC's exclusive jurisdiction over the wholesale rate contract
and over Central Vermont's pending application to modify the
contract to impose an exit fee. The motion was also accompanied by
affidavits of the two utilities' vice president and the companies'
independent auditor attesting to the severe economic harm,
including possible bankruptcy of Connecticut Valley, threatened by
the Commission's action. 
 On January 20, 1998, the Commission granted rehearing in
the rate proceeding and allowed Connecticut Valley to file
additional testimony, but the Commission did not authorize the
retail rate increases sought by the utility. In February 1998, the
Commission filed papers in the district court opposing the TRO and
disputing jurisdiction, the merits, and the predictions of
irreparable injury. Further materials were filed by Connecticut
Valley and Central Vermont, and on April 3, 1998, the district 
court held a hearing on the request for a TRO and preliminary
injunction.
 At the hearing, there were extensive arguments and
counsel brought the district court up to date as to intervening
developments. The court then took a brief recess and returned to
make extensive oral rulings, generally favorable to Connecticut
Valley and Central Vermont. Describing the Commission's conduct as
a violation of the court's earlier grant of injunctive relief
against the Final Plan, the court directed counsel for the
utilities to prepare a preliminary injunction.
 On April 9, 1997, the district court entered a formal
preliminary injunction adopting its oral rulings as findings of
fact and conclusions of law. The injunction specifically directed
the Commission to allow Connecticut Valley to recover through
retail rates the full cost of wholesale power obtained from Central
Vermont pursuant to the latter's FERC tariffs. It appears that
since that time--possibly retroactively to January 1, 1998--
Connecticut Valley has been obtaining the increased rates that it
sought in its Fall 1997 filing. 
 The Commission has now appealed from the April 9, 1998,
injunction. Its appeal raises threshold objections to the grant of
the injunction, it denies that the utilities are likely to prevail
on the merits, and it treats very briefly the issue of irreparable
injury. We consider the arguments in the same order. The familiar
requirements for a preliminary injunction and the standards for
appellate review are set forth in our companion decision.
 II. DISCUSSION
 At the threshold, the strictest limit on the district
court's jurisdiction is the Johnson Act, 28 U.S.C. 1342 (1994). 
This statute, described more fully in our companion decision,
prohibits district court injunctions against state rate orders
under certain circumstances. But one of the circumstances in which
the Johnson Act does not bar injunction against a state rate order
is where the order is found to be inconsistent with a federal
statute or federal agency determination. See 28 U.S.C. 1342(1);
New Orleans Pub. Serv., Inc. v. City of New Orleans, 782 F.2d 1236,
1242 (5th Cir. 1986), modified in part, 798 F.2d 858, cert. denied,
481 U.S. 1023 (1987); see also Aluminum Co. of America v. Utilities
Comm'n, 713 F.2d 1024, 1028 (4th Cir. 1983).
 Connecticut Valley is making just such a FERC preemption
argument in this case. Such a claim is not barred by the Johnson
Act. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14
(1983); New Orleans Pub. Serv., 782 F.2d at 1242. This is also
true of Connecticut Valley's other claim on the merits--that the
district court's earlier injunction against the Final Plan required
the Commission to allow the increase; although we have found no
case in point, it is unlikely that Congress intended that
enforcement of a federal court injunction be barred by the Johnson
Act. 
 The Commission's other threshold arguments are no more
persuasive. Even if the modified Final Plan were itself too
inchoate to make "ripe" a request to enjoin it--and we hold
otherwise in our companion decision--the Commission's action in
rejecting the Connecticut Valley rate increase is a formal agency
rate action that has an immediate effect. See generally Abbott
Labs. v. Gardner, 387 U.S. 136, 149-51 (1967). Of course, the
possibility that it might be corrected by the Commission itself or
by a state court might raise exhaustion concerns; but those are not
very powerful in the face of a claim that the rejection violates
FERC authority, and that it is going to cause immediate irreparable
injury to the utility. Cf. Bowen v. City of New York, 476 U.S. 467,
483-84 (1986); Matthews v. Eldridge, 424 U.S. 319, 330-31 (1976).
 The Commission also argues inventively that its December
31, 1997, order is akin to the so-called suspension orders by which
federal agencies, under statutes authorizing this step, temporarily
delay ("suspend") a carrier or utility increase rate while
investigating it. E.g., 16 U.S.C. 824d(e). As a matter of
federal administrative law, a refusal by the regulatory agency to
suspend rates under these statutes is usually (but not always)
deemed unreviewable because the order is an interim measure and the
shipper or customer is usually made whole automatically if the rate
increase is ultimately found unjustified.
 The present situation is in no way akin to these cases. 
Although the Commission's December 31, 1997, order did suspend the
tariffs, it also made a formal determination to disallow the
increase on the ground that it was imprudent for Connecticut Valley
to continue its contract. See Order No. 22,815. This disallowance
was final and is not akin to a mere suspension; the further
investigation contemplated by the Commission's order was directed
not to possible approval of the increase but to the possibility
that a further reduction might be ordered.
 In its last threshold objection, the Commission asserts
that the district court erred in considering the utilities' request
as a "related" case to be heard by the same judge considering the
original action brought by PSNH. It is sufficient to say that the
two matters involve a substantial overlap, amply qualifying for
consolidation under the terms of Local Rule 42.1(a) & (c) of the
New Hampshire District Court. This is so even though we ultimately
conclude that the December 31, 1997, order is not to be treated as
an implementation of the Final Plan.
 We turn now to the merits, or, more precisely, the
requirement that the party seeking injunctive relief show that it
is likely to prevail on the merits. See Ross-Simons of Warwick,
Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996). The first
ground urged by the utilities in their brief is that the April 9,
1998, injunction is justified as an extension of the earlier
injunctive relief secured by the PSNH against the Final Plan. The
district court itself, at the April 3, 1998, hearing, described the
Commission's December 31, 1997, order as an "end run" around the
earlier injunction.
 It is true that the Commission discussed the imprudence
of the Connecticut Valley-Central Vermont contract in its order
implementing the Final Plan; and both the December 31, 1997, order
and the Final Plan reflect a common desire to hold down customer
rates. Nevertheless, the disallowance of the specific increase
does not purport to rest on the Final Plan and is expressed as an
exercise of conventional cost-based rate regulation--whether or not
a lawful exercise is another matter. Thus, the injunction of April
9, 1997, requiring the rate increase, cannot be defended as
enforcing the earlier injunction against the Final Plan.
 What would support a preliminary injunction requiring the
rate increase is a determination that the December 31, 1997, order
would itself likely be found to violate the Federal Power Act or
otherwise would contravene FERC's authority. The two utilities
have argued forcefully that the December 31, 1997, order does
violate federal law in two respects: by disregarding FERC's
authority to determine what is a just and reasonable wholesale rate
and by interfering with FERC's authority to impose a termination
charge on Connecticut Valley.
 The first of these two FERC-preemption arguments is
expressed by the two utilities as a claim that the Commission has
"violated the filed-rate doctrine" in its December 31, 1997, order
rejecting the rate increase. The "filed rate" locution is commonly
used in the case law (and in more than one way), but it is merely
a shorthand as likely to confuse as to assist analysis. Indeed,
the label is somewhat misleading, since the doctrine on which the
utilities here rely is not limited to rates.
 Rather, the Supreme Court has ruled that where the FERC
has lawfully determined a rate, allocation, or other matter, a
state commission cannot take action that contradicts that federal
determination. And even without explicit federal approval of a
rate, the Court has treated a rate reflected in a FERC tariff as
setting a rate level binding on a state commission in regulating
the costs of the purchasing utility. See Mississippi Power & Light
Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 373-74 (1988);
Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 962-66
(1986); cf. Montana-Dakota Utils. Co. v. Northwestern Pub. Serv.
Co., 341 U.S. 246, 251-52 (1951).
 The difficulty for Connecticut Valley is that the 
Commission did not disallow its retail rate increase on the ground
that the wholesale rates charged by Central Vermont were unjust or
unreasonable. Rather, the Commission found that it is imprudent
for Connecticut Valley to continue purchasing from Central Vermont
since lower cost sources of energy are allegedly available--even if
Central Vermont's wholesale rate might be just and reasonable in
the conventional (regulatory) sense that that rate merely covers
Central Vermont's own acquisition costs. 
 The Supreme Court has never squarely decided the question
of whether imprudence is an escape hatch from the Commission's
otherwise existing obligation to respect FERC's authority to
determine the just and reasonable rate. But the Court has twice
said that it would assume arguendo that such escape hatch existed;
the Third Circuit has so held; and FERC has concurred, citing prior
cases of its own. See Mississippi Power & Light, 487 U.S. at 373-
74; Nantahala Power & Light, 476 U.S. at 972; Kentucky W. Va. Gas
Co. v. Pennsylvania Pub. Util. Comm'n, 837 F.2d 600, 609 (3d Cir.
1988); Palisades Generating Co., 48 FERC 61,144, at 61,574 and
n.10 (1989). We agree with FERC.
 Connecticut Valley says that the present situation is
different because it is required to purchase from Central Vermont
under a contract filed with FERC itself. It is arguable that the
Commission could not disregard a long-term commitment by
Connecticut Valley if FERC had blessed a contract that contained
such a commitment, cf. Mississippi Power & Light, 487 U.S. at 373-
74; Nantahala Power & Light, 476 U.S. at 972; but here the contract
filed with FERC itself contains a provision allowing Connecticut
Valley to extract itself on one year's notice.
 In the district court, the utilities made an alternative
argument for preemption, namely, that Central Vermont is seeking to
impose some kind of an exit fee in proceedings before FERC, and the
Commission's action in this case is trespassing on FERC's authority
to impose such a fee. As noted, FERC has in fact indicated that it
may entertain such a proposal, see 82 F.E.R.C. at 61,237, at 1998
WL 111732 (F.E.R.C.), at *1, and no doubt termination without an
exit fee could leave Central Vermont customers to bear the full
brunt of the higher cost power. But nothing in the state
commission's December 31, 1997, order precludes FERC from imposing
such a fee.
 In sum, Connecticut Valley and Central Vermont have not
shown likelihood of success on the merits, or even of fair ground
for further litigation, in claiming that the December 31, 1997,
order violates federal law insofar as it disallows the increase
sought. That disallowance is the only issue on appeal in this
case; if reductions of Connecticut Valley rates below existing
levels are ordered, it will be time enough to consider whether they
are precluded by the district court's injunction against the Final
Plan or on other grounds.
 If taken at face value, the claims of irreparable injury
made by Connecticut Valley and Central Vermont are serious. The
Commission's brief merely argues that Connecticut Valley had
alternative means of relief--to appeal the Commission's orders to
the state supreme court and to collect the higher rate pending
appeal, subject to the filing of a bond. The utilities say that
these options will not work. In all events irreparable injury is
not itself a basis for injunction, absent some claim likely to
succeed on the merits in the federal court action.
 If we have misapprehended Connecticut Valley's arguments
on the merits, it is free to petition for reconsideration; and a
timely petition for reconsideration will stay the mandate--and thus
maintain the April 12, 1998, injunction in effect until the
petition is disposed of. Fed. R. App. P. 41(a). However, if
Connecticut Valley does face the kind of calamity it predicts, it
would be wise to consider at once its alternative remedies at FERC
or through discussion with the Commission.
 Accordingly, the April 12, 1998, injunction is vacated. 
The Commission is entitled, once the mandate becomes effective, to
require Connecticut Valley to reduce rates back to the level
prevailing on December 31, 1997.
 It is so ordered.