**STATE of Missouri ex rel. UNION ELECTRIC COMPANY, Relator–Appellant,**

**v.**

**PUBLIC SERVICE COMMISSION OF the STATE OF MISSOURI, Public Counsel for the State of Missouri, and Missouri Public Interest Research Group, Respondents.**

**No. WD 40289.**

Missouri Court of Appeals, Western District.

Nov. 1, 1988.

As Modified Jan. 26, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 31, 1989.

Application to Transfer Denied March 14, 1989.

Debra H. Janoski, Paul A. Agathan, St. Louis, for relator-appellant.

Steven M. Davis, Arnold, Douglas C. Walther, Douglas M. Brooks, Jefferson City, for respondents.

Before COVINGTON, P.J., and NUGENT and GAITAN, JJ.

GAITAN, Judge.

This appeal is to determine the lawfulness and reasonableness of an order by the Missouri Public Service Commission (Commission) prohibiting recovery of approximately $106 million of Union Electric's investment in a cancelled nuclear power plant, Callaway II. The Commission concluded that Union Electric must bear the risk of loss to its shareholders for forfeiture of its investments. Additionally, the Commission concluded that because Callaway I and II were joint projects, these investors have received some return on their investment from the success of Callaway I. The order was affirmed by the Cole County Circuit Court for reasons other than those stated by the Commission. The circuit court concluded that to permit Un-

ion Electric to recover cancellation costs would amount to retroactive ratemaking which is illegal. Union Electric argues on appeal that: (1) the decision of the Commission is not supported by substantial and competent evidence; and (2) that shareholders should not bear the full risk of cancellation of Callaway II. We affirm the judgment of the Commission.

This action was initiated on December 3, 1982, by Union Electric Company when it filed proposed tariffs with the Missouri Public Service Commission designed to increase Union Electric's rates for retail electric service in Missouri. In part, Union Electric sought the Commission's permission to recover its shareholders' investment in the cancelled Callaway II nuclear generating unit but not a return on its investment.

In July 1973, Union Electric had announced its decision to build the Callaway nuclear power plants, consisting of two generating units, Callaway I and Callaway II. Prior to beginning construction, Union Electric sought and received approval from the Commission to construct, operate and maintain the two Callaway units. In its Report and Order, the Commission found that construction of the units was needed to meet present and future demands for service. The Missouri Court of Appeals for the Eastern District subsequently upheld this decision in *State ex rel. Utility Consumers Council v. Public Service Commission*, 562 S.W.2d 688 (Mo.App.1978). The Nuclear Regulatory Commission also approved the construction after conducting an independent study of the need for and economic feasibility of the plant.

In October 1981, Union Electric announced its decision to cancel construction of Callaway II due to reduced demand for electricity, run-away inflation, the inability to recover construction in progress in the rate base, and increased regulatory scrutiny and skyrocketing construction costs resulting from greater safety requirements imposed after the accident at Three Mile Island.

Union Electric initiated Case No. ER–83–163 in December 1982, proposing to recover its shareholders' investment in Callaway II over a period of five years. Union Electric chose this method because the Commission had previously approved recovery of costs associated with two coal-fired generating plants (Rush Island III & IV) previously cancelled in Case No. ER–77–154.

On October 21, 1983, the Commission issued its Final Report and Order in case No. ER–83–163, which found that § 393.135, RSMo 1978 (Proposition One), prevented recovery of all costs associated with construction and cancellation of the Callaway II plant. Union Electric filed a timely Application for Rehearing of the Commission'S Report and Order, which was denied on November 10, 1983.

The Circuit Court of Cole County affirmed the Commission's Order, and Union Electric took an appeal to the Missouri Supreme Court. On February 26, 1985, the Supreme Court reversed the Commission's decision. The Court held that Proposition One did not preclude recovery of amounts expended on a cancelled plant, and remanded the case to the Commission for further hearings. *State ex rel. Union Electric Company v. Public Service Commission*, 687 S.W.2d 162, 168 (Mo. banc 1985).

On October 28, 1985, the Commission held a hearing on the remanded issues. The parties agreed that the proceedings in Case No. ER–83–163 should be considered a continuation of the prior proceeding before the Commission, and that the record in the prior proceeding should be considered as applicable to and filed in the remanded proceedings. Additionally, the parties stipulated that the total cost incurred by Union Electric was $131,731,000, with 80.7% or $106,307,000 allocated to Missouri.

Neither the Public Counsel nor Missouri Private Interest Research Group (MoPIRG) advanced a position for recovery. Public Counsel maintained that recovery should be denied because Callaway II was not providing a benefit to ratepayers. MoPIRG argued that taxpayers should not bear the risk of investment in new plant construction or be required to pay for construction costs until the construction provided a benefit to consumers.

The Commission issued its Final Report and Order in Case No. ER–83–163 on March 28, 1986. The Commission found that shareholders had already been compensated for some of their loss through the rates of return allowed in past Union Electric cases. Additionally, the Commission found that Union Electric had finished its construction of the Callaway I plant and that its shareholders were enjoying those benefits. Based upon the above-mentioned factors, the Commission concluded that Union Electric had been compensated for its investment in Callaway II, and that any allowance of recovery in Case No. ER–83–163 would be a windfall to shareholders. Accordingly, the Commission ordered that the $106,307,000 associated with the cancellation costs of Callaway II was not a just and reasonable expense to be placed in rates and charged to ratepayers.

Union Electric filed a timely Application for Rehearing. The Commission denied the application on April 11, 1987. Union Electric appealed the Commission's decision to the Circuit Court of Cole County. On December 30, 1987, the court affirmed the Commission's decision, but did so, however, based on other reasons. The court held that Missouri law precluded the Commission from authorizing recovery of Callaway II costs because allowance of such costs would have resulted in impermissible retroactive ratemaking in violation of the Missouri Supreme Court's decision in *State ex rel. Utility Consumers' Council of Missouri, Inc. v. Public Service Commission,* 585 S.W.2d 41, 59 (Mo. banc 1979).

We begin our analysis of this case of first impression by looking at our scope of review. The court of appeals reviews decisions of the public service commission, not the judgment entered by the circuit court on review of a commission's decision. *State ex rel. Public Water Supply District No. 8 of Jefferson County v. Public Service Commission,* 600 S.W.2d 147, 149 (Mo. App.1980). A rate order entered by a public service commission may not be disturbed by the court of appeals unless it contravenes the law or is clearly contrary to the overwhelming weight of evidence.

*State ex rel. Valley Sewage Company v. Public Service Commission,* 515 S.W.2d 845, 852 (Mo.App.1974). As a reviewing court, we may not substitute our judgment on the evidence for that of the public service commission, rather we decide whether or not the commission, upon consideration of all of the evidence before it, could have reasonably made its findings and reached its announced result. *State ex rel. City of St. Joseph v. Public Service Commission,* 713 S.W.2d 593, 595 (Mo.App.1986). We may set aside decisions only when they are not supported by substantial and competent evidence on the record as a whole. *Id.* at 595.

Further, we are guided by the statutory directives of § 386.270 RSMo 1986, which provides that all rates fixed by the Commission "shall be prima facie lawful ... until found otherwise in a suit brought for that purpose pursuant to the provisions of this chapter." Additionally, § 386.430, RSMo 1986 states that any party seeking to set aside an order of the Commission shall have the burden of proof "to show by clear and satisfactory evidence that the determination, requirement, direction or order of the commission complained of is unreasonable or unlawful as the case may be."

The Missouri Supreme Court in *State ex rel. Chicago, Rock Island & Pacific Railroad Company v. Public Service Commission,* 312 S.W.2d 791, 796 (Mo. banc 1958) stated:

When we consider the purpose of the public service commission act and the specialized functions therein conferred upon the commission, the reasons for limitations upon our power of review are apparent. The public service commission is essentially an agency of the Legislature and its powers are referable to the police power of the state. It is a fact-finding body, exclusively entrusted and charged by the Legislature to deal with and determine the specialized problems arising out of the operation of public utilities. It has a staff of technical and professional experts to aid it in the accomplishment of its statutory pow-

ers.... Courts of review perform no such function. They do not examine the record under review for the purpose of determining what order they would have made. As long as the commission acts in accord with due process of law and its findings and decisions do not run afoul of constitutional and statutory requirements and the inherent powers of the courts, it is engaged in an exercise of the police power of the state, with which it is not the province of the courts to interfere.

With those legal precepts as our guide, we proceed to examine the extensive record before us.

## I. Cancellation Costs

Ratemaking is a balancing process. Although there are general guidelines and restrictions placed upon a regulatory body's discretion concerning rates, that discretion is very broad within those perimeters. The ratemaking process is analyzed in detail in Colton, *Excess Capacity: Who Gets the Charge From the Power Plant?*, 34 Hastings L.J. 1133 (1983) (hereinafter *Excess Capacity* ), and we borrow liberally from its discussion. The determination of utility rates focuses on four factors. These factors include: (1) the rate of return the utility has an opportunity to earn; (2) the rate base upon which a return may be earned; (3) the depreciation costs of plant and equipment; and (4) allowable operating expenses. Colton, *Excess Capacity, supra* at 1134. The revenue allowed a utility is the total of approved operating expenses plus a reasonable rate of return on the rate base. The rate of return is calculated by applying a rate of return to the cost of property less depreciation. The utility property upon which a rate of return can be earned must be utilized to provide service to its customers. That is, it must be used and useful. This used and useful concept provides a well-defined standard for determining what properties of a utility can be included in its rate base. *See* Colton, *Excess Capacity, supra* at 1149–50.

It is a well-accepted principle of regulation that common stockholders contribute what is known as "risk capital" to the utility company for which they receive a compensatory rate of return. Among the uncertainties that common stockholders accept in return for this added compensation is the danger of earnings shortfall, for whatever reason. Colton, *Excess Capacity supra*, at 1147.

Union Electric recognized that it could not make an acceptable argument for inclusion of cancellation costs as part of the rate base so it attempts to argue that recovery be allowed either as normal operating expenses or extraordinary losses. Normal operating expenses typically include salary and wages, and maintenance costs. *See Appeal of Public Service Co. of New Hampshire*, 125 N.H. 46, 480 A.2d 20, 22 (1984). The Commission concluded that cancellation costs did not properly belong here. The Commission's decision not to treat cancellation costs as normal operating expenses is well within its discretion to determine what items should be included as normal operating expenses. *State ex rel. Hotel Continental v. Burton*, 334 S.W.2d 75, 80 (Mo.1960). In *State ex rel. Hotel Continental*, the Supreme Court essentially states that the Commission determines what is included and excluded from a utility's operating budget. Additionally, the Commission determines how the excluded matters are handled. *Id.* at 80.

Next, Union Electric attempts to recover these costs as extraordinary losses. While the Commission accepts this approach in theory, it believes that the utility has a greater burden to justify such a cost because they are not associated with used or useful property.

The Commission concluded that the initial risk of cancellation, in this case, should be borne by the investor-stockholder. If this was not true and a stockholder could be assured a return of his investment whether the plant was cancelled or not, it would make the investment practically risk-free. The circumstances under which Union Electric obtained financing for its Callaway plants indicates that the investors did

not consider the investment risk-free. In fact, Union Electric's witness, Jerre Birdsong, testified that the relationship between risk and return is undoubtedly recognized by all investors, whether or not they are familiar with more sophisticated theories of investment analysis.

█ However, Union Electric believes that so long as the decision to build is a prudent decision, it should be allowed to recover its expenses. Union Electric cites numerous cases from other jurisdictions to support this argument. *See People's Organization v. Washington Utilities & Transportation Comm'n*, 104 Wash.2d 798, 711 P.2d 319 (1985). However, the Missouri Public Service Commission may choose to accept or reject the holdings of these jurisdictions. Here, the Commission chose to place the prudent decision theory on a scale with other factors to determine what was best. The Commission's decision to treat the cancellation as an expense outside the rate base and different from normal or extraordinary losses is within its discretion. *State ex rel. Hotel Continental*, 334 S.W.2d at 80. The Commission's decision is supported by substantial and competent evidence.

## II. Investment Recoupment

█ The Commission authorized a return of common equity based upon the discounted cash flow (DCF) method. The risk of investing in stock is an element of the DCF calculation. Regarding the DCF methodology, Birdsong testified that the riskier the stock, the lower the price and consequently, the better the return. It is not necessary to this decision that we know the exact amount. Based upon the use of the DCF method of determining the return of equity, the Commission found that stockholders have received some compensation for the risk of their investment in Union Electric which includes a risk of cancellation of the nuclear projects.

Gregory Palast, a senior associate with Union Associates of Chicago, a consulting firm, also testified for the Commission. His qualifications as an expert were undisputed. In addition, he had conducted an analysis of a major plant cancellation in 1980 on behalf of the city of Gary, Indiana. It was his position that contrary to Union Electric's assertion, its plans, through subtle accounting techniques, did provide a return on the investment. He stated that Union Electric had not properly accounted for the tax benefits of cancellation nor for the true costs of cancellation costs itself. He testified that Union Electric transferred costs associated with the cancelled Callaway II unit to Callaway I. In addition, prior to cancellation, Union Electric improperly weighted the formula for overhead charges to transfer costs to Callaway I. These accounting maneuvers improperly shifted funds to used and useful property (Callaway I) where a return is probable from Callaway II accounts on which a return is barred. Palast predicts from his studies that the market reacts positively to the cancellation of large and risky plant projects and negatively to the continuation of such projects. Further, the price of utility stock does not appear to react at all to the decision of the utility commission disposing of cancellation costs, whether the decision is favorable or unfavorable to the utility. He further testified that the transferring of costs to Callaway I from Callaway II was an accounting maneuver which switches other costs such as engineering overhead. He believed the purpose of the extraordinary accounting action was transparent: moving monies to used and useful property (Callaway I) promises recovery when that plant goes on line. He believed these transfers reduced the company's exposure to possible cost sharing if the Commission had ordered the ratepayers and investors to share the cost of Callaway II. It was his belief that Union Electric based its decision to delay cancellation on the economic cushion provided by such transfers. The ultimate decision to cancel was made at the latest possible date at which such transfers could be made—the year prior to commercial operation of Callaway I. Union Electric's procrastination on the decision to cancel Callaway II during the period 1977 through 1980 and, then, the rush to cancel in 1981 was predicated on the risk—exposure analysis determined

substantially by the assumed shift of funds between units.

Palast further testified that stockholders look to the future in investing. He stated that Union Electric's stockholders had discounted its stock, thereby reflecting their belief that Callaway II might never provide a return or even a recovery of their investment. Additionally, Jerre E. Birdsong acknowledged this perception by investors in his response to a question regarding the concerns of security analysts about the possible disallowance of cancellation costs. Mr. Birdsong testified that Moody's Investors Service warned stockholders about non-recovery of total investment as well as denial of a rate of return. Thus, it may be inferred that appellant's investors were aware of the risk that Callaway II costs would not be recovered in the event of cancellation.

Further indication of this is the fact that Union Electric planned the two nuclear power plants as a single project and proceeded with the construction. The increased costs of the project and the eventual cancellation of Callaway II were risks taken into account by stockholders who invested in Union Electric. Further, it seems that cancellation of Callaway II decreased investor exposure by decreasing the construction budget as well as stopping the dilution of its stock. Those risks were partially compensated for by the rate of return authorized by the Commission. The completion of Callaway I and the resulting improvement in the financial position of Union Electric have compensated the shareholders for their investments.

Additionally, Commission witness Palast testified in the initial phase of Case No. ER–83–163, that when Callaway I became operational, the elimination of capital needs for Callaway II would markedly improve Union Electric's financial condition. He projected that cash flow would exceed 300 percent of construction needs, coverage ratios would rise beyond the standards of AA bond rating, the ratio of equity to debt would sharply increase, and that Union Electric would not need access to the financial market for the remainder of the 1980's.

His projections were close to accurate. Union Electric's bond rating increased from BBB– to A– in Standards & Poor's and from Baa3 to A3 in Moody's Investors Service ratings. Its market to book ratio has exceeded 100 percent for the first time in over ten years. The balancing of Union Electric's need for recovery versus the effect on the ratepayers clearly indicates the increased rates associated with recovery would be unjust and unreasonable. Therefore, the shareholders did not bear the full risk of cancellation of Callaway II, which is reflected in the Commission's decision.

The investor did not invest just in Callaway nuclear plants, but invested in the entire company. The evidence indicates that Union Electric is currently enjoying the benefits of its completed construction. The shareholders have been rewarded for their investment and compensated, at least in part, for the risk they incurred. Compare these results to what has happened to the ratepayer. The ratepayer received from the inception of the project up until April 9, 1986, an increase of approximately 39.3 percent. The recovery of Callaway II cancellation costs would increase rates another approximately 10 percent on a one-time basis. Conversely, Union Electric has had a steady increase of dividends paid to its shareholders from $1.52 in 1981 to $1.85 in 1985. These increases indicate that Union Electric has continued to pay its dividends as projected and without the $106,-307,000 requested for Callaway II.

Union Electric places special emphasis on what they perceive to be the national trend relative to cancellation costs. Several jurisdictions have allowed full recovery of cancellation costs. Some of these jurisdictions have allowed amortization and a return of only a part of the unamortized portion while other jurisdictions have allowed amortization but no return on the unamortized balance. Finally, some jurisdictions completely deny recovery. *See Citizens Action Coalition of Indiana, Inc. v. Northern Indiana Public Service Co.*, 485 N.E.2d 610 (Ind.1985); *Office of Consumers' Counsel v. Public Utilities Commission*, 67 Ohio St.2d 153, 423 N.E.2d 820 (1981); *Barasch v. Pennsylvania Public*

*Utility Commission,* 516 Pa. 142, 532 A.2d 325 (1987); *Appeal of Public Service Co. of New Hampshire,* 125 N.H. 46, 480 A.2d 20 (1984) and *Re Pacific Power and Light,* 53 Pub.Util.Rep. (PUR). 4th 24 (Mont.Pub. Util.Comm'n 1983). These cases demonstrate that there is no correct or required method for treating these costs. In many of the cases in which recovery was allowed, denial of the costs would have resulted in the utility suffering multi-million dollar losses which would have forced a reduction in service to ratepayers or possibly even bankruptcy. *See Attorney General v. Department of Public Utilities,* 390 Mass. 208, 455 N.E.2d 414, 420 (1983). Such is not the case here.

For the above-stated reasons, we believe that the Commission properly performed its duty which is to balance the interest of the ratepayers with that of the shareholders. The Commission must insure just and reasonable rates. To determine whether the rates were just and reasonable, we must consider whether the order could reasonably be expected to maintain financial integrity, attract necessary capital, fairly compensate investors for the risk they assume, and protect relevant public interest. *See Union Electric Company v. Federal Energy Regulatory Commission,* 668 F.2d 389, 392 (8th Cir.1981). We believe the action of the Commission meets these requirements.

### III. Rush Island III and IV

Union Electric makes much of the Commission's decision relative to the recovery of cancellation costs associated with Rush Island III and IV. There the Commission permitted costs to be amortized over a five-year period. According to Stephen Carver, chief accountant with the Commission, the Commission staff agreed to the recommendation of recovery of cancellation costs for Rush Island units III and IV. Those cancellations costs were allowed to be amortized to expenses and recovered through rates over a five-year period with no return allowed on the unamortized balance. The staff supported that recommendation because economic savings could be demonstrated to benefit both the ratepayers and

the shareholders. Factors affecting Union Electric's decision to cancel Rush Island III and IV units were as follows: delays in onsite construction of Rush Island units I and II; rapidly increasing coal costs; environmental regulations applicable to coal-fired plants; the substantially greater capital investment required for coal-fired units; the difficulties for raising capital as well as high capital costs; and the flexibility afforded by the combustion turbines in meeting changing load conditions. The estimated cost savings from cancelling Rush Island units III and IV were within the range of $37 million to $55 million.

However, the testimony also included the fact that unattractive financing problems ultimately are passed on to the consumer. First, these financing problems impact the consumer to the extent that additional financing of construction activities increased the overall costs of capital. Such an increase is passed on currently to the consumer by including the additional financing in the capital structure employed in the establishment of current rates. Second, such an increase in capital costs is also included in the Allowance for Funds used During Construction (AFDC), thereby increasing the future investment which the ratepayer must pay a return on and provide a return of. It was also stated that ratepayers are more adversely affected because electric rates will be higher over the life of the facilities constructed in states where Construction Work in Progress is not allowed in the rate base. These and other factors apparently warranted the Commission's decision on Rush Island III and IV.

While it is true that the Commission allowed recovery of cancellation costs relative to Rush Island III and IV generating units over a five-year period, this did not set a precedent for what the appellant is seeking at this time. *See City of Columbia v. Missouri State Bd. of Mediation,* 605 S.W.2d 192, 195 (Mo.App.1980). Because the Commission functions as an arm of the legislature and has special problems arising out of the operations of public utilities, its orders and directions are always

subject to revision to meet changing conditions as the Commission, in its discretion, deems to be in the public interest. *State ex rel. Chicago, Rock Island & Pacific Railroad Company v. Public Service Commission,* 312 S.W.2d at 796.

The Commission adopted the view of the Vermont Supreme Court in *In re Central Vermont Public Service Corporation,* 144 Vt. 46, 473 A.2d 1155 (1984), which held that economic risks are part of the utility business and that even the risk of economic catastrophe may be properly assigned to owners of the utility rather than to its customers.

We believe that the Commission's decision was supported by the record. Judgment affirmed.

All concur.