

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| IN THE MATTER OF THE PETITION OF MISSOURI-AMERICAN WATER COMPANY FOR APPROVAL TO ESTABLISH AN INFRASTRUCTURE SYSTEM REPLACEMENT SURCHARGE (ISRS),<br><br>       **Appellant,**<br><br>v.<br><br>PUBLIC SERVICE COMMISSION OF MISSOURI,<br><br>       **Respondent.** | **WD82514**<br><br>**OPINION FILED:**<br><br>**NOVEMBER 19, 2019** |

**Appeal from the Public Service Commission**

**Before Division Three: Alok Ahuja, Presiding Judge, Gary D. Witt, Judge, and Anthony Rex Gabbert, Judge**

Missouri-American Water Company ("MAWC") appeals the Public Service Commission of Missouri's (Commission) order approving the company's Infrastructure System Replacement Surcharge for the MAWC's eligible infrastructure projects for the period from January 1, 2018, through September 30, 2018. MAWC asserts two points on appeal that the Commission did not find in MAWC's favor. First, MAWC contends the Commission erred in concluding that sufficient evidence was not presented to demonstrate that a deferred tax asset was incurred in 2018, arguing the Commission's order is unreasonable and arbitrary because it jeopardizes MAWC's eligibility

to utilize accelerated depreciation and is not supported by substantial and competent evidence on the whole record as to the impact of the eligible infrastructure system replacements. Second, MAWC contends that the Commission erred in issuing an order not reflecting the deferred tax asset identified by MAWC, and the order is unlawful because it focused on MAWC as a whole and failed to recognize the accumulated deferred income taxes specifically associated with the eligible infrastructure system replacements as required by Section 393.1000[1]. We affirm.

## Factual Background and Procedural History

MAWC is a "public utility" and "water corporation" pursuant to Section 386.020 and is subject to the jurisdiction and supervision of the Commission as provided by law. MAWC serves retail water customers throughout the state, including the majority of St. Louis County. MAWC is wholly owned by its parent company American Water Works. The Commission is the state agency responsible for the regulation of public utilities, including water corporations, in Missouri. § 386.250.1.

Water corporations are permitted to recover eligible infrastructure system replacement costs outside of a general rate case through an Infrastructure System Replacement Surcharge (ISRS) on customer bills.

> [A]n approved ISRS can be collected only for three years at the most, at which point it then terminates (unless a new rate case is pending). Thereafter, the [utility] has to file revised rate schedules to reset the ISRS to zero upon resolution of a general rate case. [§ 393.1006.6(1)]. The [utility] may then seek to establish a new ISRS by filing a petition pursuant to section [393.1003].

> Collectively, the ISRS statutes permit the [utility] to make single-issue rate increases between general rate cases in order to timely recover its costs for certain government-mandated infrastructure projects without the time and expense required to prepare and file a general rate case, while, at the same time, limiting the

---

[1] All statutory references are to the Revised Statutes of Missouri, 2016, unless otherwise noted.

> collection of the ISRS surcharge to three years to prevent its unlimited use outside of a general rate case.

*In re Laclede Gas Co.*, 417 S.W.3d 815, 821-822 (Mo. App. 2014). MAWC's most recent general rate case, NO-WR-2017-0285, resulted in the establishment of new rates which became effective May 2018. Because issues surrounding MAWC's previous ISRS were addressed and incorporated into that general rate case, the previous ISRS was reset to zero.

On August 20, 2018, MAWC filed "MAWC's Petition to Establish an Infrastructure System Replacement Surcharge & Motion for Approval of Customer Notice" with the Commission. Therein, MAWC requested an ISRS for its St. Louis County service territory to recover eligible costs incurred for infrastructure system replacements made during the period from January 1, 2018, through September 30, 2018. This was MAWC's first ISRS filing since MAWC's general rate case NO-WR-2017-0285. MAWC attached supporting information to its petition including documentation identifying the type of addition, utility account, work order description, addition amount, depreciation rate, accumulated depreciation, and depreciation expense. MAWC's supporting documentation also contained a proposed amount for accumulated deferred income tax. In that calculation, MAWC included what it characterized as a deferred tax asset relating to an assumed net operating loss (NOL) for 2018 in the amount of $9,577,697.

The Commission directed Commission Staff (Staff) to examine MAWC's application and submit a report/recommendation in accordance with Sections 393.1000 to 393.1006. On October 19, 2018, Staff submitted a recommendation regarding MAWC's application. Staff recommended removing the deferred tax asset from MAWC's ISRS calculation because it was not an NOL resulting from the 2018 ISRS period. Staff's recommended removal of the deferred tax asset resulted in a reduction of $866,917 to the MAWC's recoverable ISRS costs; Staff's recommended

3

ISRS revenue requirement was $6,377,959. MAWC objected to Staff's recommendation. Whether an NOL existed and, if so, what impact it had on the ISRS was MAWC's only disagreement with Staff's recommendations.

After review, the Commission made factual findings which included: 1) Only costs directly associated with the qualifying ISRS plant that became in-service during the nine months of the 2018 ISRS Period should be reflected in ISRS rates, 2) An NOL results when a utility does not have enough taxable income to utilize all of the tax deductions to which it would otherwise be entitled. The amount of the unused deductions is the NOL. An NOL is a tax return adjustment and not a regulatory item, 3) MAWC has an NOL carryover from prior years, 4) No net amount of net operating loss has been generated for income tax purposes by MAWC on an aggregate basis since January 1, 2018, the beginning of the 2018 ISRS Period, 5) IRS Private Letter Rulings cited by MAWC address time periods in which the utility in question was generating NOL amounts, 6) MAWC did not generate any NOL in the 2018 ISRS Period, 7) MAWC projects it will be able to reflect all of its net accelerated depreciation benefits associated with ISRS plant additions on its books during the next two years without the need to record any new offsetting NOL amount, 8) MAWC's NOL as of December 31, 2017, is reflected in MAWC's base rates as a result of MAWC's last general rate case, and 9) A taxpayer cannot utilize an NOL carryforward amount from a prior tax year without first exhausting all of the deductions available for the current tax year.

The Commission concluded MAWC had not provided evidence to support that it would generate an NOL in 2018, and the evidence showed MAWC was generating more revenue for 2018 than expenses qualifying for deductions. The Commission found that MAWC would be utilizing prior NOL carryovers to offset its taxable income in 2018 and 2019, but would not be generating

4

a new NOL. The Commission found that, because MAWC was expected to have taxable income in 2018, it was reasonable to conclude that MAWC would not be generating an NOL during the 2018 ISRS Period at issue. The Commission concluded, "In short, although the ISRS statute requires recognition of ADIT [accumulated deferred income taxes], which might include reflection of an NOL, we cannot allow MAWC to reduce its ADIT balance to reflect an NOL that does not exist." The Commission found that, since there was not an NOL in the 2018 ISRS Period, the question of whether an NOL was associated with the proposed ISRS was moot. The Commission concluded MAWC had complied with the requirements of the applicable ISRS statutes to authorize use of an ISRS, however, the recovery should not include an NOL; consequently, MAWC would be permitted to establish an ISRS to recover ISRS surcharges in the amount of $6,377,959.

MAWC filed a timely application for rehearing which was denied. This appeal follows.

## Standard of Review

Pursuant to section 386.510, the appellate standard of review of a Public Service Commission order is two-pronged: first, the reviewing court must determine whether the Commission's order is lawful; second, the court must determine whether the order is reasonable. *Matter of Missouri-American Water Company,* 516 S.W.3d 823, 827 (Mo. banc 2003) (internal citations omitted). We presume the Commission's order is valid, and the appellant has the burden of proving that the order is unlawful or unreasonable. *Id.* We review questions of law *de novo*. *Id.* An order is lawful if statutory authority for its issuance exits. *Id.* An order is reasonable if supported by substantial, competent evidence on the whole record and is not arbitrary, capricious, or an abuse of discretion. *Id.* "We consider the evidence, along with all reasonable supporting inferences, in the light most favorable to the Commission's order." *State ex rel. Public Counsel v. Missouri Public Service Com'n*, 289 S.W.3d 240, 246-247 (Mo. App. W.D. 2009). If the evidence

5

supports two conflicting conclusions, we defer to the Commission's factual findings. *Id.* Pursuant to Section 386.430, the burden of proof is on the party seeking to set aside the Commission's order to show by clear and satisfactory evidence that the order is unlawful or unreasonable.

**Point I**

In its first point on appeal, MAWC contends the Commission erred in concluding sufficient evidence was not presented to demonstrate that an NOL was incurred by MAWC in 2018. MAWC argues this error resulted in an unreasonable, arbitrary order because it jeopardizes MAWC's eligibility to utilize accelerated depreciation and is not supported by substantial and competent evidence on the whole record as to the impact of the eligible infrastructure system replacements.

We find that, the majority of MAWC's argument in Point I focuses not on evidence supporting that an NOL was incurred in 2018 but, rather, the potential impact to MAWC and customers of the failure of the Commission to include, pursuant to Section 393.1000, an NOL in its calculations. We find these arguments relevant only if there was an NOL that should have been included in the calculations.[2]

With regard to the existence of an NOL for the relevant ISRS time period, MAWC explains:

> The Deferred Tax asset included by the Company was created by the Net Operating Loss associated with the subject ISRS investments. This Deferred Tax asset occurs because of the various tax deductions related to those specific investments. The Company included depreciation and interest expense that

---

[2] A not-supported-by-substantial-evidence challenge requires completion of three sequential steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
(2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,
(3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

*Houston v. Crider*, 317 S.W.3d 178, 187 (Mo. App. 2010).

6

occurred during the ISRS period, accelerated depreciation, and the repairs deduction. These large deductions, taken against no revenue (there is no new revenue since general rates were set in MAWC's last rate case), create a large NOL. This NOL is multiplied by the effective tax rate to determine the Deferred Tax asset to include in the ISRS rate base.

MAWC contends that the Commission's findings of fact, that no net amount of net operating loss was generated for income tax purposes on an aggregate basis since the beginning of the 2018 ISRS Period and MAWC did not generate any NOL in the 2018 ISRS Period, is disputed by the evidence because the evidence shows that the NOL balance increases between May 2018 and June 2018.

We find that the relevant time period for determining whether an NOL was incurred is the entirety of the ISRS time period, not one month out of the entirety of the time period, and the Commissions' findings are supported by evidence in the record showing that no net operating loss was generated on an aggregate basis for that time period.

The testimony of Lisa Ferguson was relied on by the Commission. Ferguson explained accumulated deferred income taxes and how they are determined as follows:

> A utility's deferred tax reserve balance represents, in effect, a net prepayment of income taxes by a company's customers in rates prior to actual payment to the taxing authorities. MAWC may deduct depreciation expense on an accelerated basis for income tax purposes. Depreciation expense used for income taxes paid by MAWC is higher than depreciation expense used for rate making purposes. This results in what is referred to as a 'book-tax timing difference,' and creates a deferral of income taxes to the future. The net credit balance in the deferred tax reserve represents a source of cost-free funds; therefore, rate base is reduced by the deferred tax reserve balance to avoid having customers pay a return on funds that are provided cost-free to the company. Since the level of book depreciation expense is lower than the level of accelerated tax depreciation expense used for income tax purposes, customers are typically required to pay higher costs for income taxes in rates than MAWC will actually pay to the Internal Revenue Service (IRS). The difference in income taxes paid by the utility to the IRS and those amounts collected by the utility from its customers through rates are 'accumulated' to recognize the future tax liability that will eventually be paid to the IRS. In cases where a utility incurs an NOL the accumulated deferred income tax (ADIT) balance is then offset by that NOL due to the fact that the utility did not have enough taxable income to utilize all of its available deductions.

7

Ferguson testified that, the amount of deferred tax associated with MAWC's ISRS petition was determined by the sum of the tax timing differences (deductions) for repairs and accelerated depreciation applied to the investment for the ISRS period. The deferred tax liability arrived at by Staff was not contested by MAWC. In MAWC's calculation, however, MAWC then offsets the deferred tax liability by imputing an NOL. MAWC calculated the NOL used to offset the deferred tax liability by summing the tax timing differences related to repairs and accelerated depreciation with depreciation expense and interest expense, and then subtracting those reductions from zero. The zero represents the revenue MAWC has yet to recover in regard to the ISRS investment, thereby creating a "hypothetical" net operating loss amount.

Ferguson testified that a hypothetical net operating loss amount is not appropriate for recovery in an ISRS rate calculation. Ferguson explained that, if MAWC's methodology is used, "the existence of a net operating loss will *always* result from the calculation, whether the utility is actually recording an NOL amount on its books or not." Ferguson explained that, in Missouri, a utility must place investment in-service prior to obtaining recovery rates. Recovery can be sought as MAWC did on an interim basis through an ISRS filing, or through permanent rates as part of a general rate case filing. Because MAWC cannot receive ISRS revenue related to an investment until new rates are put in effect after a ruling on an ISRS request, the utility assumes zero revenue in the ISRS calculation.

Ferguson explained that MAWC was not currently generating an NOL. MAWC accumulated previous NOL's through December 31, 2017, the balance of which were included in MAWC's base rates as an offset to its accumulated deferred income tax as a result of its last general rate case. Ferguson reasoned that, therefore, for the ISRS period of January 1, 2018, through

September 30, 2018, there would have to be an incremental increase in MAWC's ongoing NOL balances directly related to ISRS plant additions for an NOL to be eligible for inclusion in the ISRS ratemaking calculation. MAWC's records show that the NOL balance decreased over time in 2018, and was expected to continue to do so.

MAWC does not file a standalone tax return; it files a consolidated tax return with parent company American Water Works. MAWC witness John R. Wilde, Assistant Vice President of Tax for MAWC's parent company, American Water Works, testified that the company would generate less of an NOL starting in 2019 and probably no NOL by the end of 2020. The evidence showed that the beginning NOL Deferred Tax Asset Balance in January of 2018 was $31,464,998. The ending NOL Deferred Tax Asset Balance in September 2018 was $21,183,942. The evidence confirmed that MAWC expected to use prior NOL balances in 2018 and 2019 because taxable income was projected for those years.

Wilde argued that the NOL reflected in MAWC's calculation was not hypothetical. He testified, "It's stated on the tax return, each of the previous years all the way back before 2008. It won't be fully utilized based on estimates today until 2019, 2020." He testified that the 2018 tax return would ultimately show an NOL because deductions would be higher than federal taxable income which would be zero. Wilde contended that failure to include an NOL calculation was in violation of tax normalization rules and a finding by the IRS that a company violated tax normalization rules or a consent decree could cause the loss of significant tax benefits. He admitted, however, that the company would have to believe a violation occurred and report that violation; he stated that the Commission could also report a violation. Wilde indicated that American Water Works had an NOL carryover balance of $148 million on December 31, 2017, and that balance would be reduced by $92.1 million by December 31, 2018. He agreed that if the

9

company did not have net operating loss carry-forward from prior years, MAWC would have taxable income. He agreed that a company cannot utilize an NOL carryover prior to exhausting all of the deductions for the current tax year. He testified that MAWC expected American Water Works to be able to reflect all of the available accelerated depreciation tax deductions associated with the 2018 ISRS plant additions on American Water's 2018 tax returns.

MAWC witness Brian LaGrand ("rates director" for MAWC) testified that the overall balance of MAWC's NOL carry-forward deferred tax asset declined since year end 2017 and was projected to continue to do so past September 2018. LaGrand testified that passage of the Tax Cuts and Jobs Act of 2017 precluded the use of bonus depreciation by utility companies, and that the use of bonus depreciation had been a large driver for utility companies to be in net operating loss situations. LaGrand agreed that the exclusion of bonus depreciation would have the opposite effect.

Rebuttal witness John S. Riley, a Public Utility Accountant III for the Office of Public Counsel, testified that he disagreed with Wilde's testimony that failure to include a net operating loss in the ISRS calculation would cause a normalization penalty with the IRS. He explained that normalization is the difference between accelerated depreciation and straight-line depreciation in regulatory revenues, resulting in a deferred tax representing the difference between the two. He testified, "So a net operating loss isn't something you really need to consider when you're talking about normalization violations." Riley disagreed with Wilde's conclusion that recognition of accumulated deferred income taxes requires recognition of both the deferred income tax liabilities and the deferred income tax assets. He stated that there is no deferred tax asset in a strict regulatory accounting format and "to say that you have to combine these two is a little bit of a stretch because I contend that a net operating loss is a tax item not a regulatory item." He stated that accumulated

10

deferred income tax in the Uniform System of Accounts is a liability account, not an asset. Riley testified that he was familiar with a private letter ruling by the IRS, entered into evidence as Exhibit No. 7, wherein a company had asked the IRS if deferred income tax should be offset with a net operating loss. The letter ruling said that the NOL carryover was taken into account and was not included and did not need to be included in the deferred tax balance.

Mark Oligschlaeger, manager of the auditing department for the Missouri Public Service Commission, also disagreed with LaGrand's and Wilde's testimony concerning the NOL issue in the ISRS. He considered their proposed inclusion of a hypothetical NOL deferred tax asset unreasonable on its own terms, concluding that such was not in any way mandated by the IRS tax normalization rules. He testified further:

> A utility that is in a position of using prior NOL to offset taxable income by mathematical necessity is able to reflect all of its current accelerated depreciation tax deductions on its tax returns going forward. As a result, it will receive the full financial benefits of such deductions. Because these benefits are provided to the utility in customer rates through collection of deferred income taxes, the resulting accumulated deferred income tax balance must be included in rate base without offset in order to provide ratepayers a return on capital they provide to the utility.

In arguing that the IRS Code does not support MAWC's position, Oligschlaeger testified:

> The tax normalization rules embedded within the IRS Code clearly state that the existence of NOLs can be a relevant consideration in assessing whether a utility is in compliance with the rules. However, the Code specifies that NOLs may be relevant in two specific situations. First, when the utility is unable to reflect all of its accelerated depreciation tax deductions in its tax returns, thus creating a new NOL. And second, when a utility's balance of an already existing NOL deferred tax asset increases due to the Company's continuing inability to reflect all available tax deductions on its returns.

> However, neither situation applies to Missouri-American during this particular ISRS period. So far in 2018, MAWC has not generated any new NOL in the aggregate and as a result its existing NOL balance has been decreasing, not increasing. Since MAWC is not currently generating any additional amount of NOL in aggregate, no violation of the tax normalization rules is at risk in this case.

11

Oligschlaeger testified that none of the private letter rulings of the IRS cited by MAWC were relevant to MAWC's financial and taxable position as, unlike MAWC, all of the utilities in question were generating NOL amounts. Oligschlaeger testified that MAWC's position on NOL ratemaking was inconsistent with the intent and theory behind the IRS tax normalization rules because it would lead to customers not being compensated for capital provided by them to MAWC in the form of deferred income taxes.

On appeal, MAWC disagrees with the Commission's conclusions and argues that "the fundamental error of the Commission is that it assumed such an offset to taxable income without specifically addressing the issue of normalization and without addressing the unopposed evidence of MAWC's inability to benefit from the deductions resulting from the eligible infrastructure system replacements." Yet, the Commission heard evidence from all sides regarding these issues and found that there was "no legal support for MAWC's position that an exclusion of an NOL would violate normalization requirements of the IRS Code." Hence, we cannot agree that the Commission did not specifically consider and address this issue. The private letter rulings relied upon by MAWC are not binding precedent and MAWC does not dispute the Commission's finding that all of the rulings relied upon by MAWC involved situations where NOLs were actually generated, not hypothetically generated.

Nevertheless, MAWC asks this court to find that disallowing inclusion of its proposed NOL is inconsistent with the purpose behind the normalized method of accounting because customers receive the benefit of the tax deduction now, through a lower ISRS rate, even though the Company

is unable to benefit from those tax deductions at this time.[3]  We cannot readily agree.

The record shows that it is undisputed by the parties that, under the IRS Code, a company is allowed to deduct certain costs against income for tax purposes at different times than when it is allowed to reflect the same costs as a reduction to income for financial reporting purposes.  This is referred to as "timing differences."  It is also undisputed that a timing difference that results in significant financial benefits to companies is the ability of companies to use "accelerated depreciation" deductions for tax purposes under the IRS Code.  The parties agree that, for ratemaking purposes, under the normalization method, the tax benefits associated with timing differences are retained by the utility for a period of time before being passed on to ratepayers.  Tax normalization is applied by collecting income tax expense amounts in rates calculated as if the particular tax deduction or treatment was not available to the utility.  Customers end up paying an amount of income tax expense in rates that exceeds the utilities' actual current income tax liabilities.  The excess payments are charged to deferred income tax expense accounts.  These excess payments represent capital that the utilities can use for a period of time and is thereby considered "cost-free" funds.

---

[3] MAWC also references a 2010 consent agreement MAWC entered with the IRS which authorized the Company's requested Change in Accounting Method to allow utilization of a repairs deduction method.  MAWC states that, "If the Company did not agree to the terms, then it would not have been allowed the additional repairs deduction on its tax returns.  One of the requirements of that consent agreement is that MAWC use a normalize method of accounting, even though a tax repairs deductions is not otherwise specifically subject to []the tax normalization rules."  Yet, the Consent Agreement states that, at the time the Company requested to change its method of accounting for repair and maintenance costs, the Company capitalized the repair and maintenance costs and recovered those "as prescribed by §168(a)."  26 U.S. Code § 168 does not apply to "[a]ny public utility property (within the meaning of subsection (i)(10)) if the taxpayer does not use a normalization method of accounting."  26 U.S. Code § 168(f).  This suggests that MAWC was already using a normalization method of accounting at the time of the Consent Agreement and that it was not a new requirement imposed by the Consent Agreement.  Further, receipt of the tax benefit of accelerated depreciation requires tax normalization for ratemaking purposes, and the record shows that MAWC was also accelerating depreciation prior to the Consent Agreement.

MAWC argues that an ISRS allows a utility to recover costs for certain infrastructure investments between general rate cases in order to incentivize utilities to invest in such infrastructure between general rate cases. MAWC argues that the intent of Congress in creating the normalization rules is to provide the utility an interest free source of funds to invest in utility property. (Citing IRS Revenue Proc. 2017-47, p.2). IRS Revenue Proc. 2017-47 states that one objective of the normalization rules is to preserve the utility's incentive to invest through enactment of the Investment Tax Credit and accelerated depreciation. "Recognizing that public utility rates are set based on the utility's costs incurred to provide the utility service, including federal income tax expense, Congress enacted a set of rules to assure that some or all of the value of the incentives it provided for capital investment would not be diverted from investment by utilities to lower prices for consumption by customers of utilities." *Id.*

Here, MAWC continues to accelerate depreciation. MAWC witness Wilde testified that MAWC expected American Water to be able to reflect all of the available accelerated depreciation tax deductions associated with the 2018 ISRS plant additions on American Water's 2018 tax returns. Hence, MAWC will realize the benefits of this tax deduction. The real question posed by MAWC is whether, in enacting normalization rules, Congress intended for zero revenue to be imputed in ISRS computations so that a net operating loss for that investment will result, leading to increased customer rates following ISRS proceedings so as to provide additional cost-free funds to the utility. We cannot answer this question in the affirmative with the record before us. Because it is undisputed that normalization resulted in cost-free investment funds being provided to the utility long before the ISRS application at issue, we cannot say that failure to impute an NOL in this ISRS proceeding thwarts the purpose of normalization. Theoretically, incentive funds previously received by the company are being used for this ISRS investment. Further, through the

14

ISRS process, the utility will still recover costs on the investment even if incentive funds are used to support the investment.

> Collectively, the ISRS statutes permit the gas company [or water company] to make single-issue rate increases between general rate cases in order to timely recover its costs for certain … infrastructure projects without the time and expense required to prepare and file a general rate case, while, at the same time, limiting the collection of the ISRS surcharge to three years to prevent its unlimited use outside of a general rate case.

*In re Laclede Gas Co.*, 417 S.W.3d at 821-822.  Additionally, "[a]fter the PSC's initial approval of an ISRS, the water corporation can file for permission to make periodic adjustments to the ISRS to update the amount of the surcharge being collected."  *Agnew v. Missouri-American Water Company*, 567 S.W.3d 652, 656 (Mo. App. 2018) (citing § 393.1006.5(2)).

We find the Commission's determination that no NOL was incurred by MAWC in the relevant 2018 time period supported by substantial, competent evidence on the whole record and, therefore, reasonable.[4]  MAWC's first point on appeal is denied.

**Point II**

In its second point on appeal, MAWC contends the Commission erred in not reflecting the NOL identified by MAWC in its order arguing the order is unlawful because it focuses on the company as a whole and fails to recognize the accumulated deferred income taxes specifically associated with the eligible infrastructure system replacements as required by Section 393.1000. MAWC argues that the Commission's conclusions regarding MAWC not having an NOL in 2018 are irrelevant to the requirements of Section 393.1000(1)(a) which defines "Appropriate Pretax Revenues" in part as:

---

[4] MAWC appears to dispute only the reasonableness of the Commission's order, not its lawfulness, in MAWC's first point on appeal.

15

the revenues necessary to produce net operating income equal to: (a) The water corporation's weighted cost of capital multiplied by the net original cost of eligible infrastructure system replacements, including *recognition of accumulated deferred income taxes and accumulated depreciation associated with eligible infrastructure system replacements* which are included in a currently effective ISRS.

(Emphasis added). MAWC argues that the Commission focuses on the tax status of MAWC as a whole which necessarily means that MAWC's investment tax impacts beyond the eligible infrastructures system replacements were considered. MAWC argues that the Commission ignored evidence provided by MAWC that relates specifically to the eligible infrastructure replacements.

MAWC does not dispute the Commission's finding that, "An NOL is a tax return adjustment and not a regulatory item." MAWC files a consolidated tax return with its parent corporation, American Water Works. In MAWC's response to Data Request No. 0005 regarding "NOL Detail" and the question, "Is MAWC currently expected to generate additional NOL amounts in 2018 and 2019 on an aggregate basis, or to use prior NOLs to offset taxable income in 2018 and 2019 in the aggregate?" MAWC stated:

> MAWC expects to use prior NOLs in 2018 and 2019 because it is part of its parent company's, American Water Works (AWW), consolidated group which projects income for those tax years. AWW projects to use approximately $391 million in 2018 and approximately $320 million in 2019. NOL usage is allocated based on an individual company's NOL carryforward as a percentage of the total group's NOL carryforward balance. For 2018, MAWC is estimated to be allocated approximately $56 million, which when tax-effected will reduce the deferred tax asset by approximately $11.7 million. For 2019, MAWC is estimated to be allocated approximately $45 million, which when tax-effected will reduce the deferred tax asset by approximately $9.5 million.

(Schedule LMF-d4). MAWC witness John Wilde testified that tax returns for 2018 would not be filed until 2019. When asked, "An NOL is not attached to any certain infrastructure, any particular asset?" he responded, "You're correct with that." Public Counsel's tax expert John Riley testified similarly, stating that, in contrast to identifying deferred tax liability to an asset, "an NOL is not

16

asset specific and cannot be tied to any specific ISRS qualifying or non-ISRS qualifying infrastructure investment."

In response to Staff Data Request No. 0005, MAWC acknowledged that it expected to use prior NOL balances in 2018 and 2019 because the consolidated tax group was projecting taxable income for those years. MAWC also provided monthly balances of MAWC's NOL deferred tax asset starting December 31, 2017, thorough the most current available, and provided projected monthly balances through December 31, 2019. (Schedule LMF-d3). These balances were MAWC's and the parent corporation's estimates as to MAWC's NOL Deferred Tax Asset balances separate from the parent company. Yet, these NOL carryovers are technically not MAWC specific because they are allocated to MAWC on a percentage basis from the parent company's overall NOL tally.

The Commission found that MAWC provided no evidence to support that it would have an NOL in 2018, and the evidence showed that, because MAWC was generating more revenue for 2018 than it was generating expenses qualifying for deductions, MAWC would be utilizing prior NOL carryovers to offset its taxable income in 2018 and 2019. The Commission found that, because no NOL was generated during the 2018 ISRS Period, the question of whether an NOL is associated with the proposed ISRS is moot. We agree. Had there been evidence of an NOL, Section 393.1000 would have necessarily required inquiry into whether the NOL generated could be linked to eligible infrastructure system replacements.

The statutory language requires recognition of "accumulated" deferred income taxes. MAWC's NOL deferred tax asset balance as of year-end 2017 was reflected in MAWC's base rates following the general rate case. MAWC evidence showed that no NOL had been generated after that time, nor was any expected to be generated during the January 1, 2018 through September 30,

17

2018 time frame. MAWC's proposal to include an NOL amount in the ISRS was based on the theory that the addition of ISRS plant to MAWC's rate base without immediate receipt of new revenues reduced its taxable income below the level that would result if the ISRS plant addition had not been made. MAWC claimed this delayed the rate at which MAWC could utilize prior accumulated NOLs as a carry-forward against future taxable income. Yet, direct rate recovery of investment by a utility can only occur after that investment is in service; it must be used and useful. *State ex rel. Union Electric Co. v. Public Service Commission*, 765 S.W.2d 618, 622 (Mo. App. 1988). Applying incremental tax deductions associated with new plant investments to zero incremental revenue creates a hypothetical net operating loss but does not show whether the utility is actually generating an NOL associated with that investment.

The Commission heard MAWC's evidence regarding delayed use of prior accumulated NOLs as a result of the plant additions but found the evidence that MAWC was not generating or booking any actual NOL during the ISRS period most compelling. Because MAWC's calculations regarding alleged NOLs associated with the specific plant improvements were hypothetical, we cannot agree that the Commission's reliance on actual data from MAWC which reflects that MAWC as a whole, with the specific plant improvements incorporated into that data, accumulated no NOL during the relevant time period was in error. MAWC had the burden of proof regarding the amount of deferred income taxes associated with eligible infrastructure system replacements being accumulated during the relevant time period.

The Commission's order which evaluated MAWC's total NOL data in reaching the conclusion that no NOL was accumulated during the ISRS Period was not unlawful. Deferred income taxes and depreciation associated with eligible infrastructure system replacements were not excluded from the ISRS computation. MAWC's second point on appeal is denied.

## Conclusion

The Commission's order is affirmed.

_Anthony Rex Gabbert, Judge_

All concur.